2020 UT App 52

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF J.M. AND M.M.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

M.M.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20190673-CA
Filed March 26, 2020

Third District Juvenile Court, Salt Lake Department
The Honorable Julie V. Lund
Nos. 1156280 and 1156281

Thomas A. Luchs, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

HARRIS, Judge:

¶1 After appellant M.M. (Mother) brought her two young children (M.M. and J.M., collectively referred to as the Children) to the hospital because they were having trouble breathing, M.M.'s urine tested positive for amphetamines, including methamphetamine. The State's Division of Child and Family Services (DCFS) took custody of the Children, and placed them with foster parents. The juvenile court found the Children

neglected by Mother, and set a goal of reunification with Mother. For nearly a year, however, Mother did very little to comply with the reunification plan, and she was eventually incarcerated for probation violations related to previous criminal drug offenses she had committed. At that point, the court terminated reunification services and changed the primary permanency goal to adoption. Around the same time, the State filed a petition to terminate Mother's parental rights.

¶2    Once she was incarcerated, though, Mother turned over a new leaf. Without the assistance of DCFS, Mother entered an inpatient drug treatment program and completed it successfully, and she eventually fulfilled all of the other requirements that the juvenile court had originally set for her. But she completed the inpatient treatment program only about four weeks prior to the termination hearing, and based on the evidence presented at that hearing, the court ordered Mother's parental rights terminated. Mother now appeals that order. Although each of us may not have ordered termination were we in the juvenile court's position, we cannot conclude that the juvenile court committed reversible error here, given our standard of review. We therefore affirm the order of the juvenile court.

BACKGROUND[1]

¶3    Mother's substance use began when she was around thirteen years old. Initially, Mother was only using marijuana, but over the course of her teenage years, she progressed to using methamphetamine. In 2013, at the age of eighteen, Mother gave birth to her first child, A.M., who was born fetally exposed to methamphetamine. Thereafter, A.M. was removed from her

---

1. "We recite the facts in the light most favorable to the juvenile court findings." *See In re K.J.*, 2013 UT App 237, ¶ 2 n.2, 327 P.3d 1203.

custody, and her parental rights to A.M. were eventually terminated. Later, A.M. was adopted by foster parents.

¶4      In July 2016, Mother gave birth to M.M., who was also born fetally exposed to methamphetamine. In addition, M.M. was born with a heart defect and has required special medical care, including a recent surgery. In October 2017, Mother gave birth to J.M. Paternity to the Children has never been established.

¶5      On February 23, 2018, Mother noticed that the Children were both having trouble breathing, so she took them to a local hospital, where they were diagnosed with respiratory illness and admitted for treatment. The medical staff conducted a number of tests on the Children, and those tests initially came back negative for illegal substances. When further testing was done, however, it was discovered that methamphetamine was present in M.M.'s urine. At some point, the hospital apparently received an anonymous phone call alleging that Mother had used methamphetamine around the Children. Hospital officials alerted DCFS to the situation, and DCFS opened an investigation, eventually taking the Children into custody and placing them with the same foster parents who had previously adopted the Children's half-sibling A.M.

¶6      At an adjudication hearing in April 2018, the juvenile court found that Mother had neglected the Children, and that finding is not contested on appeal. The court set reunification as the primary permanency goal, with a concurrent goal of adoption. The court ordered DCFS to provide reunification services to Mother and ordered Mother to comply with a child and family plan that required her, among other things, to: submit to a mental health evaluation and complete recommended treatment; submit to a substance abuse evaluation and complete recommended treatment; submit to random urine tests for drugs; maintain stable housing and employment; and "complete all obligations with criminal court."

¶7    Between April and December 2018, Mother never failed to attend a scheduled visit with the Children (except when incarcerated), and she interacted appropriately with them during her visits. But Mother substantially failed to comply with most other aspects of the reunification plan. For example, while Mother did complete both mental health and substance abuse evaluations, she did not complete the recommended treatment. Additionally, Mother missed many of her scheduled drug tests, and many of the tests she did take came back positive for marijuana or methamphetamine. At one point in the summer of 2018, Mother began outpatient substance abuse treatment at a treatment facility (Treatment Facility), but she failed to complete the program.

¶8    Moreover, Mother did not appropriately address all of her pending criminal matters. In September 2018, she was ordered to serve thirty days in jail for probation violations. Even after being released, Mother continued to test positive for illegal substances, including methamphetamine. Mother was reincarcerated on November 29, 2018.

¶9    In light of Mother's incarceration and her failure to comply with the terms of the reunification plan, in December 2018 both the State and the guardian ad litem (GAL) asked the court to terminate reunification services and change the permanency goal to adoption. After a hearing, the juvenile court agreed with this request, and made findings that Mother had been "unsuccessful in completion of her service plan" and that "return of the [C]hildren would create a substantial risk of detriment" to their emotional or physical well-being. The court terminated reunification services and changed the permanency goal to adoption. A few weeks later, the State filed a petition for termination of Mother's parental rights.

¶10    After being incarcerated again in November 2018, Mother finally started taking meaningful steps to address her issues. She enrolled in educational programs at the jail, including a GED

class, and obtained her GED in just four weeks, which she claimed made her "the fastest GED graduate in jail history." She began attending substance abuse treatment groups inside the jail, and in January 2019 she was able to arrange a release from the jail directly to an inpatient program at Treatment Facility. Mother resided at Treatment Facility for four months, and she successfully completed the inpatient program there prior to her release on May 22, 2019. While at Treatment Facility, all of her drug tests came back clean. Her programming at Treatment Facility included not only substance abuse treatment, but also education in a number of other areas, including mental health and parenting skills.

¶11    In March 2019, while Mother was at Treatment Facility, she asked the juvenile court to reinstate reunification services, asserting that she had made "remarkable progress" in the program. The court noted that Mother had done "amazingly well" at Treatment Facility, but denied Mother's motion for additional reunification services on the ground that "Mother does not need services from [DCFS] at this point," due to the fact that she was receiving appropriate services at Treatment Facility. In recognition of Mother's significant progress, however, the court "expanded visitation" for Mother with the Children. At that time, a date had already been set for a trial regarding the State's petition to terminate Mother's parental rights, and the court kept that date on the calendar.

¶12    The three-day termination trial took place in mid-June 2019, about four weeks after Mother's release from Treatment Facility. The State called two expert witnesses—psychologists who had evaluated Mother and M.M.—and the Children's foster mother, as well as a DCFS social worker. The GAL also called, as a limited expert, another social worker. The psychologist who evaluated Mother explained that she conducted the evaluation before Mother had been admitted to the residential program at Treatment Facility; she discussed Mother's ongoing struggles with substance use and described other conditions Mother

sometimes experienced, such as "forgetfulness, disorganization, impulsivity, [and] restlessness."

¶13    M.M.'s evaluator testified that, in her opinion, M.M. had been exposed to a number of traumas, including exposure to substance use, hospitalization, and removal from Mother's care, and stated that children who have been traumatized often struggle when separated from their caregivers. The expert also testified that, while M.M.'s ability to regulate her emotions and control her temper improved during the time she was in her foster family's care, her ability to interact smoothly with adults was negatively impacted by her visits with Mother.

¶14    The foster mother testified that the Children were shy and timid during visits with Mother, and often returned to the foster mother for hugs even while Mother was in the room. The foster mother also testified that, while M.M. was in her family's care, M.M. had required heart surgery at the Mayo Clinic in Minnesota, and the foster family had arranged for this surgery and accompanied M.M. on the trip to Minnesota. The foster mother also testified that the Children called her "Mom" and saw her as their mother, and that they had bonded strongly with the other children in the household.

¶15    As part of its presentation at trial, the State attempted to introduce evidence regarding Mother's history of drug abuse, including evidence concerning the circumstances that led to the termination of Mother's parental rights with regard to A.M., the Children's half-sibling. Mother's attorney objected to the admission of any evidence that Mother's parental rights as to A.M. had been terminated, but the court ultimately overruled Mother's objection.

¶16    Mother called five witnesses at trial, in addition to herself: her therapist, case manager, programming teacher, and housemate from Treatment Facility; and her probation officer. Each of these individuals explained the progress they had

witnessed Mother make during and after the time she was at Treatment Facility, and they specifically described the decline in her criminal activity, the improvement in her finances, and the substantial improvements Mother had made toward sobriety. The case manager, in particular, testified that Mother's time at Treatment Facility had brought about a "drastic change" in Mother, and that she began "consistently working on building sober supports" and "finding healthy people in her life" while in the program. The case manager said that Mother had been "a remarkable participant" in the program because "she was always very organized, very structured, very determined," "she took feedback well, [and] she was very good at working on her emotional regulation." Her therapist and case manager both testified that they had high hopes for her future success. And Mother's probation officer testified that Mother had been staying out of legal trouble, and that, at the time of trial, Mother had not committed any additional probation violations. The probation officer added that all of Mother's drug tests, both during and after her time at Treatment Facility, had come back clean.

¶17    Mother herself also testified at trial, explaining everything she had learned through her care at Treatment Facility, the progress she felt she was making, and how happy it made her to spend time with the Children during their visits.

¶18    In its closing argument, the State emphasized Mother's long history of substance use and her relative lack of experience with sobriety in the community, noting that, since her early teen years, Mother's "longest period of sobriety [has been] seven and a half months," and even that was only recently "attained in a very highly structured setting" in jail and later at Treatment Facility. The State argued that "Mother has never maintained her sobriety outside of a structure of jail or treatment."

¶19    After considering all of the evidence, including Mother's past and current conduct, the juvenile court terminated Mother's parental rights. In its order, the court found four statutory

grounds for termination. First, the court found that "Mother has neglected the [C]hildren," noting specifically Mother's "habitual or excessive use of . . . controlled substances." Next, the court found that Mother "is unfit or incompetent" to parent the Children, again noting Mother's history of substance use. Third, the court found that Mother "has substantially neglected, willfully refused, or has been unable or unwilling to remedy the circumstances that caused the [C]hildren to be in an out-of-home placement, and there is a substantial likelihood that Mother will not be capable of exercising proper and effective parental care in the near future." Finally, the court found that "Mother has experienced a failure of parental adjustment in that she has been unable or unwilling within a reasonable time to substantially correct the conduct or conditions which led to the [C]hildren's placement outside of the home."

¶20 Next, the court found that "it is in the best interest of the [C]hildren to have the parental rights of Mother terminated so that the [C]hildren can be adopted and protected from further neglect and/or abuse." On this point, the court specifically took into account the "safety and well-being of the [C]hildren," as well as their "physical, mental or emotional condition and needs." The court found that the Children need stability and an "assurance" that they "will be given care, treatment, and guidance that will assist them in developing into self-sufficient adults," and determined that the Children were currently receiving that level of care with the foster parents. The court noted that it had specifically "considered and explored 'less permanent arrangements' such as custody and guardianship with a family member," but that "[n]o such kinship is available." As part of the best-interest inquiry, the court found it to be "strictly necessary" that Mother's parental rights be terminated.

¶21 The court made specific findings about Mother's improved behavior following her November incarceration. The court noted its duty to consider evidence of both current and past events, and to weigh whether Mother's current improved

behavior overcame her poor past history. While acknowledging that Mother's "progress since she was released from jail to [Treatment Facility] has been significant," the court concluded that "the 6 months that she has been sober and participating in treatment does not overcome her lengthy history of drug abuse and neglect beginning in 2014 with . . . [A.M.] and her failure to respond to DCFS services at that time and for the first 9 months of this case."

## ISSUES AND STANDARDS OF REVIEW

¶22　Mother now appeals from the juvenile court's order terminating her parental rights, and asks us to consider three issues. First, Mother challenges the court's determination that statutory grounds for termination exist in this case. "The ultimate conclusion that a parent is unfit or that other grounds for termination have been established is a legal question, but such decisions rely heavily on the juvenile court's assessment and weighing of the facts in any given case." *In re E.A.*, 2018 UT App 83, ¶ 2, 424 P.3d 1169 (quotation simplified). Accordingly, we afford "a high degree of deference" to a juvenile court's decision with regard to the existence of statutory grounds, and overturn it only when the result is "against the clear weight of the evidence or leave[s] [us] with a firm and definite conviction that a mistake has been made." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (quotation simplified). In sum, "when a foundation for the [juvenile] court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *Id.*

¶23　Second, Mother takes issue with the juvenile court's decision to admit and consider evidence regarding the previous termination of her parental rights to A.M., asserting that this evidence is impermissible "prior act" evidence barred by rule 404(b) of the Utah Rules of Evidence. We review the juvenile court's decision to consider this evidence under "a deferential standard of review" that acknowledges that trial court judges are

"in a better position than we are to assess the avowed basis" for such evidence, "so the question for us is not whether we would have admitted this evidence," but rather whether the court below "abused [its] broad discretion in doing so." *State v. Thornton*, 2017 UT 9, ¶ 56, 391 P.3d 1016.

¶24 Finally, Mother appeals the court's determination that termination of her parental rights was in the best interest of the Children. We afford a juvenile court's best-interest decision "a high degree of deference," *see In re D.V.*, 2017 UT App 80, ¶ 11, 397 P.3d 853, reversing only for "clear error," which we find when "the result is against the clear weight of the evidence or leaves [us] with a firm and definite conviction that a mistake has been made," *In re K.J.*, 2013 UT App 237, ¶ 9, 327 P.3d 1203 (quotation simplified).

## ANALYSIS

¶25 Utah courts apply a two-part test to determine whether to terminate parental rights, asking first "whether statutory grounds for termination are present," and then "whether termination of the parent's rights is in the best interest of the affected child." *In re B.T.B.*, 2018 UT App 157, ¶ 4, 436 P.3d 206 (quotation simplified), *cert. granted*, 440 P.3d 692 (Utah 2019). Courts terminate parental rights only when both of these elements are met and supported by clear and convincing evidence. *See id.* ¶ 13. In this case, the juvenile court found both parts of the test satisfied, and entered an order terminating Mother's parental rights. Mother now challenges both parts of that order, and in addition complains that the court improperly considered evidence of her past parental experience with A.M.

## A

¶26 Our legislature has authorized courts to terminate parental rights "if the court finds any one of" several statutory

grounds for termination. Utah Code Ann. § 78A-6-507(1) (LexisNexis 2018). In this case, the juvenile court made findings that four of the enumerated statutory grounds were present. First, it found that Mother "ha[d] neglected" the Children. *See id.* § 78A-6-507(1)(b). Second, it found that Mother is "unfit or incompetent" to parent the Children. *See id.* § 78A-6-507(1)(c). Third, it found that the Children were being cared for in an out-of-home placement; that Mother had "substantially neglected, willfully refused, or has been unable or unwilling to remedy the circumstances" that led to the Children being cared for in an out-of-home placement; and that "there is a substantial likelihood that [Mother] will not be capable of exercising proper and effective parental care in the near future." *See id.* § 78A-6-507(1)(d). Fourth, it found that Mother had experienced a "failure of parental adjustment." *See id.* § 78A-6-507(1)(e).

¶27 In challenging the court's findings on statutory grounds, Mother spends the entirety of her energies discussing the manner in which the juvenile court weighed her past behavior against her current improved behavior. The interplay between Mother's past behavior and her current improved behavior is certainly relevant to *some* of the statutory grounds, such as whether Mother "is unfit," or perhaps whether there has been a "failure of parental adjustment." *See id.* § 78A-6-507(1)(c), (e). It is also relevant (as discussed below) to our rule 404(b) inquiry and to the ultimate question of whether termination of parental rights is in the best interest of the Children. But it is not, by definition, relevant to the question of whether Mother "has neglected" the Children. *See id.* § 78A-6-507(1)(b).

¶28 "Has neglected" is a past-tense locution; it is by nature different than language asking a court to examine whether a parent is currently neglecting a child. We begin any statutory interpretation inquiry by examining the plain meaning of the language employed by the legislature. *See, e.g., Anadarko Petroleum Corp. v. Utah State Tax Comm'n*, 2015 UT 25, ¶ 11, 345 P.3d 648 (stating that "[w]hen interpreting a statute, we look first

to the plain and ordinary meaning of its terms"). On its face, the past-tense nature of the language used indicates a legislative intent that past episodes of neglect, even if they occurred a while ago and even if the parent has since taken steps to improve her behavior, are enough to meet the statutory requirements. And our supreme court has held that the tense used—whether past or present—in statutory language is important. *See Scott v. Scott*, 2017 UT 66, ¶¶ 1, 24, 423 P.3d 1275 (stating that "[a] statutory reading that credits a verb's tense is not uncommon," and determining that "*is* should mean *is* and not *was* or *has been*"); *see also Carr v. United States*, 560 U.S. 438, 448 (2010) (stating that, "[c]onsistent with normal usage, we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach"). And this is in keeping with general rules of statutory interpretation, which require us to "presume that the legislature used each word advisedly," *see Scott*, 2017 UT 66, ¶ 22 (quotation simplified), and to give meaning to each word used, wherever possible, *see State v. Stewart*, 2018 UT 24, ¶ 12, 438 P.3d 515.

¶29   The juvenile court found that Mother neglected the Children in February 2018 when she exposed M.M. to methamphetamine. Mother does not challenge this adjudication on appeal, nor does she contend that her improved behavior following her November incarceration somehow changed the facts underlying the previous neglect finding. Because the legislature—by using the past-tense phrase "has neglected" instead of a present-tense phrase like "is currently neglecting"—has mandated a lookback-style inquiry, an adjudicated and un-appealed past act of neglect by a parent will by definition result in a judicial determination that the parent "has neglected" the child.[2] And for the purposes of this inquiry, there is no need—at

---

2. By contrast, the legislature chose to use present-tense language when discussing parental fitness. *See* Utah Code Ann. § 78A-6-507(1)(c) (LexisNexis 2018) (stating that one statutory

(continued…)

least not at this stage—to engage in any weighing of a parent's past behavior against a parent's improved current behavior. Once neglect has occurred, a juvenile court is entirely justified in making a finding that a parent "has neglected" a child, even if that parent has improved herself since.[3]

---

(…continued)
ground for termination of parental rights is that "the parent *is* unfit" (emphasis added)). Where unfitness (as opposed to neglect) is the statutory ground at issue, the question presented is whether the parent, at the time of the termination trial, "is" a fit parent. *Id.* As part of this inquiry, a court will need to examine and weigh a parent's previous acts that might demonstrate unfitness against any current acts that might demonstrate improvement. *See In re M.L.*, 965 P.2d 551, 558, 560–62 (Utah Ct. App. 1998). The same may be true with regard to whether there has been a failure of parental adjustment, given statutory language mandating consideration of a parent's compliance with a reunification plan. *See* Utah Code Ann. § 78A-6-508(5) (Supp. 2019); *see also In re M.L.*, 965 P.2d at 560–62. But with regard to those two statutory grounds, it is the language of the statute that mandates a present-tense inquiry; the same cannot be said of the "neglect" ground.

3. We recognize that, because many child welfare cases arise due to an act of abuse or neglect on the part of a parent, at least one statutory ground for termination of parental rights will be present in many, if not most, child welfare cases. Partly for this reason, we felt it important in *In re B.T.B.* to do away with the "almost automatically" line of cases and to restore the best-interest prong of the termination of parental rights test to full strength, in order to give a parent who believes she has—in the time since the abuse or neglect occurred—improved her parenting and her bond with her child an opportunity to present
(continued…)

¶30 Mother's failure to appeal either (a) the juvenile court's original neglect adjudication or (b) the court's later finding that Mother "has neglected" the Children results in Mother being unable to carry her burden of persuasion on appeal regarding statutory grounds for termination. The termination statute itself, as noted above, plainly states that the presence of "any one" statutory ground for termination is sufficient. *See* Utah Code Ann. § 78A-6-507(1). Interpreting that statute, we have held that the presence of a single statutory ground is sufficient to fulfill the first element of the termination test. *See In re A.J.*, 2017 UT App 235, ¶ 26, 414 P.3d 541 (stating that "so long as sufficient evidence existed to support at least one of the grounds found by the court, the termination of [a parent's] parental rights [is] appropriate"); *In re S.M.*, 2017 UT App 108, ¶ 4, 400 P.3d 1201 (per curiam) (explaining that "the finding of a single [statutory] ground will support termination of parental rights"); *In re H.H.*, 2011 UT App 60, ¶ 2, 249 P.3d 582 (per curiam) (explaining that a juvenile court may terminate a parent's rights "if the court finds any one of the grounds enumerated" in the statute (quotation simplified)). And "we will not reverse a ruling of [a lower] court that rests on independent alternative grounds where the appellant challenges [less than all] of those grounds." *See Kendall v. Olsen*, 2017 UT 38, ¶ 12, 424 P.3d 12 (quotation simplified).

¶31 Accordingly, we reject Mother's contention that none of the statutory grounds for termination is present here.

B

¶32 Next, Mother argues that the juvenile court should not have admitted and considered evidence regarding the

---

(…continued)
evidence, at the best-interest stage, of her improved situation. *See In re B.T.B.*, 2018 UT App 157, ¶ 23 n.6, 436 P.3d 206, *cert. granted*, 440 P.3d 692 (Utah 2019).

termination of her parental rights to A.M. Mother maintains that the admission of this evidence violated rule 404(b) of the Utah Rules of Evidence, but because that rule does not apply in this instance, we reject Mother's argument.

¶33    Rule 404(b)(1) prohibits the admission of evidence relating to a crime, wrong, or other act "to prove a person's character in order to show that *on a particular occasion* the person acted in conformity with the character." Utah R. Evid. 404(b)(1) (emphasis added). Typically, this rule functions to prevent the admission of past acts as evidence of a person's propensity to act, on a particular occasion, in conformity with a character trait.

¶34    But in this case, as the GAL correctly notes, the evidence in question "was not admitted to prove Mother's actions 'on a particular occasion' but to prove her general incompetency and unfitness over a period of time." Indeed, the evidence was admitted to help the court assess a number of inquiries that were not necessarily connected to any single occasion, including whether Mother was currently fit to parent the Children and whether termination of parental rights would be in the Children's best interest.[4] In these sorts of inquiries, consideration of a parent's past actions is not only allowed, but encouraged, both by the Juvenile Court Act and by case law interpreting it.

---

4. We acknowledge that rule 404(b) could potentially be relevant in juvenile court child welfare cases, depending on how the evidence is used. A different admissibility question would be presented if, for instance, a juvenile court were asked to adjudicate whether a parent committed an act of abuse on a particular occasion and, in an attempt to prove that the parent committed the act in question, the State wished to present evidence that the parent committed a past act of abuse on a different victim on a different occasion.

¶35　In parental termination cases in which a parent's fitness is at issue, our legislature requires courts to consider a parent's "habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs," as well as a parent's "history of violent behavior." Utah Code Ann. § 78A-6-508(2)(c), (f) (Supp. 2019). And when parental fitness is at issue, we have often affirmed a juvenile court's consideration of evidence of a parent's past acts, including past drug use and past abuse of siblings. *See, e.g.*, *In re R.B.*, 2012 UT App 37, ¶ 4, 271 P.3d 827 (stating that "a parent's habitual substance abuse and repeated or continuous failure to appropriately care for and provide for the needs of her children" may be indicative of a parent's unfitness (quotation simplified)); *In re J.S.P.*, 2010 UT App 10U, para. 6 (per curiam) (affirming a termination order based, in part, on the parent's previous abuse of the child's sibling); *In re J.B.*, 2002 UT App 267, ¶ 24, 53 P.3d 958 (affirming a termination order based, in part, on previously adjudicated facts involving the child's siblings); *In re E.K.*, 913 P.2d 771, 776 (Utah Ct. App. 1996) (affirming a juvenile court's exercise of jurisdiction over a younger sibling in part because of a recent adjudication of serious abuse of other children). In this case, this evidence was also considered in connection with the best-interest part of the termination test, and that is a wide-ranging inquiry that asks a court to weigh the entirety of the circumstances, including a parent's past behavior, to determine what is in the best interest of the child under all of the circumstances. *See In re B.T.B.*, 2018 UT App 157, ¶ 47–50.

¶36　Mother has not demonstrated that rule 404(b) operates to keep a juvenile court from considering a parent's past acts in connection with a fitness or a best-interest inquiry. Therefore, in this case, the court's consideration of the circumstances involving Mother's loss of rights to A.M. was entirely appropriate, and we reject Mother's argument to the contrary.

## C

¶37    Finally, Mother takes issue with the juvenile court's conclusion that termination of her parental rights was in the best interest of the Children. Once a court finds a statutory ground for termination, it must next address the second part of the test by determining whether severing a parent's rights is in the best interest of the child. "The best interest of the child has always been a paramount or polar star principle in cases involving termination of parental rights." *In re J.P.*, 648 P.2d 1364, 1368 (Utah 1982) (quotation simplified). And, as noted above, determining a child's best interest requires a court to undergo a comprehensive review of the unique and specific conditions a child faces in any given case. *See In re B.T.B.*, 2018 UT App 157, ¶ 47–50. Accordingly, the juvenile court's inquiry into a child's best interest is necessarily quite "broad, and is intended as a holistic examination of all of the relevant circumstances that might affect a child's situation," and includes an analysis of "the physical, intellectual, social, moral, and educational training and general welfare and happiness of the child." *Id.* ¶ 47 (quotation simplified). The breadth of this "subjective assessment based on the totality of the circumstances surrounding the child" has "never been diminished" and remains a "paramount consideration in cases involving termination of parental rights." *Id.* (quotation simplified).

¶38    The juvenile court heard evidence in this case that cut both ways on the best-interest question. On the one hand, the court heard evidence that Mother, chiefly through her uncontrolled substance use, had endangered her children on previous occasions. Two of her three children had been exposed to methamphetamine while in utero. She continued to use methamphetamine after the birth of the Children, which led to the February 2018 episode in which methamphetamine was found in M.M.'s urine. Even after that episode, which resulted in the Children being taken from her, Mother did very little over the next nine months to comply with the plan that the juvenile

court set out that would enable her to be reunited with the Children. Mother continued to use methamphetamine, failed to seek and complete drug treatment, and committed multiple violations of her criminal probation. The court also considered evidence that the Children were happy and well-adjusted with the foster parents, who are ready and willing to adopt them, a placement that would unify them with their half-sibling A.M.

¶39 On the other hand, the juvenile court heard evidence that Mother's November 2018 incarceration functioned as a real wake-up call for her. Between November 2018 and the time of trial in June 2019, Mother's behavior was nothing short of exemplary. With the able assistance of personnel both at the jail and at Treatment Facility, Mother was not only able to complete an inpatient substance use treatment program, but was also able to get a GED, obtain new parenting skills, and continue building her bond with the Children. Indeed, the evidence presented was that, after the court terminated reunification services in December 2018, Mother completed each and every item in her child and family plan, without the benefit of any services from DCFS. At trial, some of the counselors who worked with Mother at Treatment Facility testified that Mother had been very successful in their program, that she had learned a lot of the skills necessary to succeed after returning to the community, and that they had high hopes for her success.

¶40 Presented with evidence like this, the juvenile court could have reasonably gone either way on the best-interest question. Indeed, after *In re B.T.B.*, it no longer follows "almost automatically" from a finding of statutory grounds that it is in the best interest of the child to terminate a parent's rights. *See In re B.T.B.*, 2018 UT App 157, ¶ 44. Even though a statutory ground for termination (neglect) is present here, the juvenile court could potentially have determined that the best interest evidence militated in the other direction, and could have therefore declined to terminate parental rights. Given Mother's significant progress following her incarceration, there exists

sufficient evidence in this record to support such a determination, or at least a determination that Mother's termination trial should have been postponed for a few months to give Mother a longer post-treatment probationary period.

¶41    But the juvenile court decided to terminate, concluding that it was in the Children's best interest to terminate Mother's rights. The court made extensive findings supporting its conclusion, and was ultimately swayed by several factors, including Mother's lengthy past history of substance use and relatively short (four-week) history of sobriety outside the context of an inpatient treatment facility, and the positive experience the Children were having with the same foster parents who had previously adopted A.M. The court emphasized the need for the Children to find stability and permanence, and ultimately found that those goals were best furthered through termination and adoption.

¶42    Each of us might not have reached the same decision that the juvenile court reached, had we been in the juvenile court's position. But that does not make the court's decision reversible. Our court has recognized that "the juvenile court is in the best position to weigh conflicting testimony, to assess witness credibility, and from such determinations, to render findings of fact" and, therefore, "an appellate court should not substitute its own judgment for that of the juvenile court's judgment in matters relating to termination proceedings." *In re B.O.*, 2011 UT App 215, ¶ 2, 262 P.3d 46 (per curiam). In reviewing cases like this one, we "must be capable of discriminating between discomfort over a trial court's findings of fact—which [an appellate court] must tolerate—and those [situations] that require a court's intercession." *See In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (quotation simplified). And the standard of review we apply in these cases is so deferential that we must "forebear disturbing the close call," even if we may view the facts in a different light. *Id.* (quotation simplified); *see also id.* ¶ 14 ("Simply because an appellate court may have come to a different result

had it been the initial trier of fact does not permit it to reverse the juvenile court absent a firm and definite conviction that the court's decision was against the clear weight of the evidence."); *Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2015 UT App 261, ¶ 21, 361 P.3d 703 (Orme, J., concurring) (stating that "standards of review really do matter," and noting that two of the judges on the panel were "affirming the trial court's decision—not because [they thought] it was the right decision but because of [the] deferential standard of review").

¶43 The juvenile court's best-interest decision was supported by competent findings and by record evidence. Accordingly, we defer to the juvenile court's ultimate determination. *See In re C.T.*, 2018 UT App 233, ¶ 11, 438 P.3d 100.

## CONCLUSION

¶44 Statutory grounds existed to support a termination order, given the juvenile court's unchallenged adjudication of neglect. The juvenile court properly considered Mother's history with A.M. in assessing Mother's fitness as a parent and in evaluating the best interest of the Children. While the best-interest inquiry appears to have been a close call, the juvenile court's finding is supported by evidence and articulated findings, and is therefore not subject to reversal under applicable standards of review. We therefore affirm the juvenile court's termination order.

———————