2021 UT App 57

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.H. AND N.H.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

K.H.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20190846-CA
Filed May 28, 2021

Third District Juvenile Court, Salt Lake Department
The Honorable Mark W. May
No. 1148287

Colleen K. Coebergh, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce and Dixie Jackson,
Guardians ad Litem

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and DIANA HAGEN concurred.

POHLMAN, Judge:

¶1      K.H. (Father) appeals the juvenile court's termination of his parental rights as to A.H. and N.H., raising three arguments. First, Father contends that he was denied his right to effective assistance of counsel. Second, he contends that the juvenile court erred in finding that the Division of Child and Family Services (DCFS) provided reasonable efforts toward reunification. Third, he contends that the juvenile court's reasoning and reliance on

the ground of unfitness in terminating his rights was flawed. We affirm.

BACKGROUND[1]

¶2 Father and R.R. (Mother) have three young children together: four-year-old A.H., two-year-old N.H., and an infant, Am.H., who was born during the course of these proceedings. This appeal concerns only Father's parental rights as to the older children, A.H. and N.H. (collectively, the Children). Mother's parental rights are not at issue in this appeal, and we mention her only when relevant and necessary for context.

*The Initial Verified Child Welfare Petition*

¶3 Father and Mother's relationship was "off and on, volatile and abusive." After reports of drug use in the home and an incident of domestic violence in August 2017, the Children were taken into protective custody and placed with foster parents. Soon afterward, the juvenile court ordered Mother and Father not to have contact with each other. In October 2017, the court held Father's adjudication hearing and disposition hearing on the same day. The court concluded that Father neglected the Children, that they should remain in the custody of DCFS, and that the primary goal for the Children was reunification with their parents with a secondary goal of adoption.

¶4 After this hearing, the court also entered findings of fact, including findings about the August 2017 domestic violence incident. Specifically, the court found that Father arrived at the home to find Mother doing drugs. Mother then pulled a knife on

---

1. "We recite the facts in the light most favorable to the juvenile court findings." *In re J.M.*, 2020 UT App 52, ¶ 3 n.1, 463 P.3d 66 (cleaned up).

Father, and Father twisted her arm to get the knife away before leaving. The Children were present during the incident and were frightened.[2]

¶5    At the disposition hearing, the juvenile court also addressed the reunification service plan with regard to Father. At that time, a separate plan had not yet been created for Father, but it was explained to him that the requirements of Mother's plan also applied to him. Father confirmed that he had "gone over all the requirements of the service plan," and the court found that Father understood them.

*The Period of Reunification Services*

¶6    Beginning in October 2017, a separate service plan created just for Father required, among other things, Father to submit to random drug testing, complete a substance abuse evaluation and a domestic violence assessment, complete a parenting class, participate in weekly supervised visitation with the Children, provide financially for the Children, and maintain a stable and healthy living environment for them. By the December 2017 review hearing, Father had completed the domestic violence assessment but had not called in to drug test. At the next review hearing in February 2018—six months after the Children were removed—Father had attended domestic violence treatment, but he had failed to take all the requested drug tests, had tested positive for THC[3] on some drug tests, and had not attended

---

2. Father was charged with several offenses, but the charges were later dismissed.

3. "'THC' is an acronym for tetrahydrocannabinol, which is a crystalline compound that is the main active ingredient of cannabis." *State v. Akers*, 2018 UT App 235, ¶ 3 n.3, 438 P.3d 70 (cleaned up).

drug treatment. Although at both hearings DCFS and the guardian ad litem (the GAL) asked to schedule a permanency hearing based on Father's and Mother's failure to fully engage in services, the juvenile court denied those requests.

¶7     By the final review hearing in May 2018—nine months after removal—Father was taking domestic violence classes and had been more consistent in calling in to determine whether he should submit to a drug test. But he was still missing some calls and tests and was still testing positive for THC. Additionally, Father had been verbally aggressive with a DCFS caseworker after a visit had to be canceled because he arrived too late. As a result, the court ordered Father to participate in anger management classes.

¶8     The court held a permanency hearing in August 2018—twelve months after removal. At this point, Mother was making progress and had the Children in a trial home placement. For his part, Father was also doing well, and he had begun attending drug and alcohol treatment, domestic violence treatment, and anger management classes. By the parties' agreement, the court found that there had been substantial compliance with the treatment plan, reunification was likely within ninety days, and continued services were in the Children's best interests. Thus, the court extended reunification services for another three months.

¶9     In November 2018—fifteen months after removal—the juvenile court held a second permanency hearing, during which it considered the GAL's motion to terminate the trial home placement and reunification services. Things had "not gone well" for Mother; she had a positive drug test, missed taking the Children to doctor appointments, and had been kicked out of her in-patient treatment center. Father had "done better"; he had completed his substance abuse treatment and was close to finishing his domestic violence classes. But he had missed

call-ins for his drug tests until mid-September 2018 and had not completed a psychological exam. Although DCFS discussed placing the Children with Father, he was "decidedly non-committal" and refused to allow DCFS to inspect his home. When asked who would watch the Children while he worked, he answered, "I've never thought about it, I don't know." And although he was asked in October 2018 to create a plan for how he would handle daycare, work, and medical appointments, he still had not submitted a plan before the second permanency hearing. The Children were returned to foster care, while DCFS, Mother, and Father asked for reunification services to be extended again. But the juvenile court found that even though there had been "substantial progress by both parents, there was not clear and convincing evidence that reunification was probable within 90 days." Accordingly, the court terminated reunification services and changed the Children's permanency goal to adoption.

¶10 Shortly afterward, Mother and Father's newborn, Am.H., was placed in DCFS custody in a separate child welfare case. Even though reunification services were terminated with respect to A.H. and N.H., nearly the same services were ordered and in place for Am.H.'s case.

*The Petition to Terminate Parental Rights and the Termination Trial*

¶11 DCFS petitioned to terminate Mother's and Father's parental rights as to A.H. and N.H. Father then changed attorneys, and Father's new counsel represented him during the ten-day trial before the juvenile court.

¶12 To his credit, Father continued to improve and "largely rehabilitated himself" in the time between the second permanency hearing and trial. Nevertheless, the juvenile court found that Father's "lackadaisical approach to services and the length of time that it took him to achieve substantial rehabilitation [had a] destructive effect [on] his parent/child

relationship," and the court ultimately terminated Father's parental rights as to the Children.

¶13 After trial, the juvenile court issued a seventy-nine-page written decision and made extensive findings regarding Father's efforts and reunification services. Regarding drug testing, the court found that Father tested positive ten times for THC, repeatedly failed to call in to determine if he should test, and provided excuses about his failures to call in that were not credible. Even when the caseworker and the court "constantly reminded" him to submit to drug tests, Father "purposely refused." Instead, Father decided "to test only when he wanted," which effectively "deprived the Court of the ability to determine if he was using drugs other than marijuana" because, in the court's experience, sophisticated drug users know how to time drug tests so that the tests "only reveal[] marijuana use but not other substances." The court found that Father's first clean drug test was nine months after the Children's removal and that Father did not consistently call in to be tested until mid-September 2018. Thus, by the second permanency hearing, Father had complied with this aspect of the service plan for only two months. The court noted, however, that he had been clean since services were terminated. As for the required substance abuse evaluation, the court found that Father completed that portion of the service plan.

¶14 Father had mixed results on other requirements in the service plan. He had not finished the domestic violence assessment before the second permanency hearing but did finish before trial. Regarding the anger management classes, Father completed that requirement of the service plan, yet he "continue[d] to have outbursts after he completed treatment." Concerning the psychological evaluation, Father had not

completed it before the second permanency hearing.[4] Father managed to do so before trial, but it was unknown whether Father had participated in the recommended therapy.

¶15   As for the required parenting class, Father completed it, but "it did not have the desired effect." He was "not able to sufficiently improve his parenting abilities in relation to" A.H. and N.H., and he was not in compliance with this requirement by the second permanency hearing in November 2018.

¶16   One month earlier, in October 2018, Father began Parent Child Connections Interactive Therapy (PCCIT), which is designed to "support the development of healthier child-parent interactions and improve attachment patterns overall." During PCCIT, Father acknowledged that he "felt like he did not have a lot of skills to handle [A.H.]," who has disabilities. A PCCIT therapist also observed that Father "did not have a close relationship with [N.H.]." Overall, Father attended five PCCIT sessions. A PCCIT therapist observed that N.H. showed "fear and hesitation towards" Father and that although in later sessions N.H. started going to Father earlier in the session, "her reunions with [Father] still highlight[ed] significant anxiety." The therapist also observed that Father "had to work to set limits with [A.H.] and often tends to just give [A.H.] what he wants and allows him to be aggressive" but that Father had improved in the last two sessions. The PCCIT sessions stopped in November 2018 because the court ended reunification services and changed the Children's goal to adoption. Even though Father wanted to continue PCCIT and pay for it himself, the court denied that request because it was inconsistent with the goal of adoption. And although PCCIT could have been started

---

4. The court observed that Father "had a pattern of claiming confusion on court orders with which he disagreed or with which he did not want to comply."

earlier, a PCCIT therapist testified at trial that even if Father "had been given the full amount of time to complete PCCIT[,] she did not think therapy would have been successful because [Father] made minimal progress in the time he had."

¶17 With one exception, Father regularly attended his weekly supervised visits with the Children. The visits were "troubling," however, because Father persisted in bringing toys and food even when asked not to do so. The toys and food interfered with creating a "normal" setting for the evaluators to observe the parent/child interaction and led the Children to view Father "as a party dad or a type of Santa—one who comes with toys and gifts." While Father complied with the requirement to attend visits, he showed a "lack of progress" and never "progressed to unsupervised visits."

¶18 In terms of the requirement to provide financially for the Children, the court found that Father had "paid nothing in child support" since the court became involved in the matter and that he owed a total of $11,841.75 in back payments. At the same time, Father testified that he had $7,000 in savings and owned his mortgaged home. The court further found that Father works three jobs and had the ability to pay child support. Father told the court that he would pay child support if the Children were returned to him, but the court found that this statement showed that Father "fundamentally misunderstands the concept of child support." Because Father "has purposely avoided his obligation," the court found that Father did not comply with this portion of the service plan "at any time."

¶19 As for Father's housing situation, the court found that at the time of the second permanency hearing, Father "did not have a stable and healthy living environment for his Children." Multiple times, Father "purposely refused" to allow DCFS to inspect his home until after services were terminated. By the end

of December 2018, however, his home was deemed suitable for children.

¶20    At trial, Father testified that he contacted the Office of Child Protection Ombudsman (the Ombudsman) in December 2018 to express concerns over how DCFS had handled his case. The Ombudsman issued a letter in which it "largely validated [Father's] concerns," and in his defense, Father presented the Ombudsman's opinion to support his position that DCFS did not provide reasonable services to him. But the court found that the Ombudsman did not speak with Father's caseworkers and supervisors and did not review all the relevant documentation. The court thus had "serious concerns about the quality of the investigation done by [the Ombudsman]." In written detail, the court discredited much of the Ombudsman's opinion, finding instead that DCFS provided adequate support to Father.

¶21    Notably, in rejecting the Ombudsman's opinion, the court found that Father "did not take reunification services seriously for nearly a year." According to the court, Father "knew what was expected" of him, yet he "showed little interest in reunification until he realized too late that [Mother] was not going to have the [C]hildren returned to her." Indeed, "[c]ajoling by the caseworker at visits and by the Court at review hearings appeared to have little effect." And even when DCFS "made a push to return" the Children to Father in the fall of 2018, Father "showed little interest" in reunification. The court further found that "[b]y his own fault, not [DCFS's], [Father] chose to rely on [Mother] to get the [C]hildren back," and thus he "just took a lackadaisical approach to completing services on time" and "did not seriously engage in services in a timely fashion." Ultimately, the court found that DCFS "made a fair and honest attempt to provide services to [Father] and the services provided to [Father] were reasonable."

¶22 The juvenile court recognized that while Father had "limited general parenting skills with young children," he was "doing better"; he had "a steady job, an appropriate home and is drug free." In fact, by the end of trial, Father had the infant, Am.H., in a trial home placement. The court saw that Father was "developing further skills at managing and appropriately responding to his children." Yet the court observed that "providing daily care of three young children would be a significant challenge," especially considering A.H.'s disabilities. When Father was given special training on how to deal with A.H., he "did not seem to learn or progress in his understanding." The Children did not have an attachment to Father, and even though Father had some positive interactions with the Children, those interactions were "more about drinking, eating, and playing with toys," not "a need by the children for affection or connection (physical or emotional) with" Father.

¶23 Significantly, with respect to N.H., the court found that during the time it took Father to improve himself, "the parent-child relationship was severely damaged." N.H. was never in Father's custody before she was removed, and thus "no parent/child relationship ever existed" between them. Further, the court found that no relationship between Father and N.H. "developed over the course of the case" and that N.H. "has never viewed [Father] as a caregiver or parent and she is apprehensive in his presence." The court concluded that Father's present parenting ability did not help him with regard to N.H. and his "lackadaisical approach to services deprived him of the opportunity to form a meaningful parent/child bond" with N.H.

¶24 With respect to A.H., the court found that while Father and A.H. had a parent/child relationship before A.H.'s removal, "that relationship has drastically changed" in the two years since then. For example, A.H. was excited to see Father at visits but his excitement was "more about drinking, eating, and playing," and when the visits ended, A.H. did not initiate hugs with Father or

whine for Father not to leave. Instead, A.H. would run to his foster parents. The court found that A.H.'s relationship with his foster parents "has transformed into the only meaningful attachment relationship that he has" and that removing A.H. from them would present "a danger of [A.H.] suffering from Reactive Attachment Disorder." The court concluded that the duration of A.H.'s removal and the length of time that "it took [Father] to substantially rehabilitate himself had a significant destructive effect on their parent/child relationship"; thus, Father's "present parenting ability [did] not overcome the destructive effects of his past actions/inactions."

¶25 Additionally, the court made findings about Mother and Father's relationship, which it viewed as "concerning" and "troubling." The court found that Mother and Father "largely ignored" the court's no-contact order, and Father stated in April 2019 that they were living together. It also noted that while Mother and Father tried at trial "to downplay the amount of domestic violence that had occurred between them," they were "quite upfront" in evaluations "about the significant role domestic violence had played in their relationship." It further found that Father "has problems setting boundaries with [Mother]," that he had "chosen to remain" with Mother, and that "[a]s a couple they cannot properly raise [the Children]." The court noted that it had returned custody of Am.H. to Father, not Mother, and that if Father "reunites" with Mother, Am.H.'s "custody situation could change."

¶26 In conclusion, the juvenile court found five grounds for terminating Father's parental rights as to A.H. and N.H. *See* Utah Code Ann. § 78A-6-507(1)(b)–(f) (LexisNexis 2018).[5] The court also found that terminating Father's parental rights was in the Children's best interests. *See id.* § 78A-6-503(12). It added that

---

5. We cite the statutes in effect at the relevant time.

termination "would also prevent the substantial likelihood of continued neglect if the [C]hildren were returned to the parents." It also found that the Children "view the foster parents as their caretakers and providers," not Father and Mother, and that the foster parents are "ready and willing to adopt" the Children. Furthermore, the court found that terminating Father's parental rights was "strictly necessary" and in the Children's best interests so that their foster parents could adopt them. *See id.* § 78A-6-507(1).

¶27 Accordingly, the juvenile court entered an order terminating Father's parental rights as to A.H. and N.H.[6] Father appeals.

ISSUES AND STANDARDS OF REVIEW

¶28 Now represented by different counsel on appeal, Father raises three main issues. First, Father asserts that his trial counsel rendered constitutionally ineffective assistance in various ways. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *In re S.S.*, 2015 UT App 230, ¶ 20, 360 P.3d 16 (cleaned up).

¶29 Second, Father asserts that the juvenile court erred in finding that DCFS provided reasonable efforts toward reunification. "A court's determination that DCFS made reasonable efforts to provide reunification services involves an application of statutory law to the facts that presents a mixed question of fact and law, requiring review of the juvenile court's factual findings for clear error and its conclusions of law for

---

6. The juvenile court terminated Mother's parental rights as to A.H. and N.H. at the same time that it terminated Father's parental rights. Mother appealed separately, and this court affirmed the juvenile court's order.

correctness, affording the court some discretion in applying the law to the facts." *In re N.K.*, 2020 UT App 26, ¶ 15, 461 P.3d 1116 (cleaned up).

¶30 Third, Father asserts that the juvenile court erred in terminating his parental rights on the ground of unfitness. "The ultimate conclusion that a parent is unfit or that other grounds for termination have been established is a legal question, but such decisions rely heavily on the juvenile court's assessment and weighing of the facts in any given case." *In re J.M.*, 2020 UT App 52, ¶ 22, 463 P.3d 66 (cleaned up). We thus "afford a high degree of deference to a juvenile court's decision with regard to the existence of statutory grounds, and overturn it only when the result is against the clear weight of the evidence or leaves us with a firm and definite conviction that a mistake has been made." *Id.* (cleaned up). Further, "when a foundation for the juvenile court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *Id.* (cleaned up).

ANALYSIS

¶31 To terminate parental rights, the juvenile court must make two separate findings by clear and convincing evidence. *See In re B.T.B.*, 2020 UT 60, ¶ 46, 472 P.3d 827; *see also* Utah Code Ann. § 78A-6-506(3) (LexisNexis 2018); *In re C.Z.*, 2021 UT App 28, ¶¶ 17–18, 484 P.3d 431. "First, it must find grounds for termination under Utah Code section 78A-6-507." *In re B.T.B.*, 2020 UT 60, ¶ 46 (cleaned up). Clear and convincing evidence establishing "any one" of the enumerated statutory grounds for termination is sufficient to fulfill the first finding for termination. *See* Utah Code Ann. § 78A-6-507(1) (LexisNexis 2018); *see also In re J.M.*, 2020 UT App 52, ¶ 30, 463 P.3d 66; *In re F.C. III*, 2003 UT App 397, ¶ 6, 81 P.3d 790. Second, the court "must find that termination of the parent's rights is in the best interests of the child." *In re B.T.B.*, 2020 UT 60, ¶ 46 (cleaned up); *see also* Utah

Code Ann. § 78A-6-503(12) (LexisNexis 2018). As part of the best-interests inquiry, "a court must specifically address whether termination is strictly necessary to promote the child's welfare and best interest." *In re B.T.B.*, 2020 UT 60, ¶ 76; *see also* Utah Code Ann. § 78A-6-507(1). Additionally, when "the court has directed [DCFS] to provide reunification services to a parent, the court must find that [DCFS] made reasonable efforts to provide those services before the court may terminate the parent's rights." Utah Code Ann. § 78A-6-507(3)(a).

¶32 The juvenile court in this case found five separate grounds to terminate Father's parental rights: (1) "the parent has neglected . . . the child," *id.* § 78A-6-507(1)(b); (2) "the parent is unfit or incompetent," *id.* § 78A-6-507(1)(c); (3) "the child is being cared for in an out-of-home placement under the supervision of the court or [DCFS] . . . [and] the parent has substantially neglected, wilfully refused, or has been unable or unwilling to remedy the circumstances that cause the child to be in an out-of-home placement; and . . . there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care in the near future," *id.* § 78A-6-507(1)(d); (4) "failure of parental adjustment," *id.* § 78A-6-507(1)(e), which means that the parent has been "unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by [DCFS] to return the child to that home," *id.* § 78A-6-502(2); and (5) "only token efforts have been made by the parent . . . to support . . . the child," *id.* § 78A-6-507(1)(f). The juvenile court also found that terminating Father's parental rights was strictly necessary and in the Children's best interests. Father does not challenge the court's decision regarding the Children's best interests.

¶33 We now turn to Father's arguments regarding ineffective assistance of counsel, reasonable efforts at reunification, and grounds for termination.

## I. Ineffective Assistance

¶34 Father first contends that his trial counsel provided ineffective assistance in four respects. First, he argues that trial counsel misunderstood that the initial adjudication was not being relitigated at trial and thus employed a flawed trial strategy aimed at the domestic violence incident underlying the initial adjudication. *See supra* ¶¶ 3–4. Second, Father argues that trial counsel "devoted a significant portion of the trial" urging the juvenile court to rely on the Ombudsman's opinion, which was ultimately discredited. Third, Father argues that trial counsel misunderstood or was unaware of the applicable law, process, and court rules, including the burden of proof, and he further claims that trial counsel erroneously believed proving a justification for the domestic violence incident would mitigate the harm to the Children. Fourth, Father argues that trial counsel introduced or emphasized harmful evidence, including that Father had $7,000 in savings and had paid his own attorney fees and that Father had physically disciplined his older child several years earlier.

¶35 "To prevail on an ineffective assistance of counsel claim, [Father] must show that (1) 'counsel's performance was deficient' and (2) this 'deficient performance prejudiced the defense.'" *See In re C.M.R.*, 2020 UT App 114, ¶ 19, 473 P.3d 184 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *see also In re E.H.*, 880 P.2d 11, 13 (Utah Ct. App. 1994) (stating that parents are entitled to effective assistance of counsel in child welfare proceedings and adopting "the *Strickland* test to determine a claim for ineffective assistance of counsel in proceedings involving termination of parental rights"). "Because failure to establish either prong of the [*Strickland*] test is fatal to

an ineffective assistance of counsel claim, we are free to address [Father's] claims under either prong." *See In re C.M.R.*, 2020 UT App 114, ¶ 19 (cleaned up).

¶36    Father has identified some questionable decisions on trial counsel's part. But even if trial counsel did perform deficiently, we resolve Father's ineffective assistance claims on the prejudice prong.

¶37    To establish prejudice, Father "must 'demonstrate a reasonable probability that the outcome of [his] case would have been different absent counsel's error. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding.'" *See id.* ¶ 21 (quoting *State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350). In evaluating the likelihood of a different result, we "consider the totality of the evidence before the judge," bearing in mind that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Strickland*, 466 U.S. at 695–96.

¶38    Father has not carried his burden of demonstrating prejudice. "To establish ineffective assistance of counsel in parental rights termination proceedings, it is imperative that a parent demonstrate deficient performance and prejudice for each ground justifying termination." *In re B.H.*, 2003 UT App 160U, para. 4. Thus, because the juvenile court found five statutory grounds warranting the termination of Father's parental rights, Father must explain why the court's finding on each ground likely would have been different but for trial counsel's alleged deficient performance. *See* Utah Code Ann. § 78A-6-507(1) (LexisNexis 2018) (stating that the court may terminate parental rights upon finding "any one" ground for termination). He has not even attempted to do so.

¶39    Instead, Father generally asserts that trial counsel's tactics "detracted from the fact that [Father] had done everything

necessary to cure the domestic violence situation found in the initial adjudication" and that trial counsel "set the stage" for the court to believe Father "doesn't get it," because the defense cast blame on Mother for the domestic violence incident. (Cleaned up.) But the juvenile court acknowledged that Father "spent a lot of time presenting evidence" of his continued work on services up to the time of trial, and the court gave Father credit for his progress, finding that he had "largely rehabilitated himself" by the time of trial. And apart from trial counsel's arguments, the court had other evidence that Father did *not* progress in important ways. For example, the court found "the initial parenting class was not successful, even according to [Father]," and Father's visits with the Children never progressed to unsupervised visits. What's more, the court found that Father did not seriously engage in services in a timely manner. Father's delay was especially problematic in this case because it had a significant destructive effect on his parent-child relationship with A.H. and prevented him from developing any parent-child relationship with N.H.

¶40    Referring to the approximately twelve-month timeframe after a child's removal during which a parent must show progress in changing the conduct or condition that required the removal, the court explained the importance of "removing the child from the legal limbo of State custody as soon as possible so as to provide that child with a permanent and stable home." (Quoting *In re M.L.*, 965 P.2d 551, 560 (Utah Ct. App. 1998).) The court further recognized the connection between "a parent's inaction over a long period of time" and "the deterioration of the parent-child relationship during that time period." (Quoting *In re M.L.*, 965 P.2d at 560.) The court's approach was consistent with Utah caselaw, which directs that "the weight which a juvenile court must give any present ability evidence is necessarily dependent on the amount of time during which the parent displayed an unwillingness or inability to improve his or her conduct and on any destructive effect the parent's past

conduct or the parent's delay in rectifying the conduct has had on the parent's ability to resume a parent-child relationship with the child." *See In re B.R.*, 2007 UT 82, ¶ 13, 171 P.3d 435 (cleaned up). In this case, even if trial counsel had done more to emphasize Father's rehabilitation or less to emphasize Father's rationalization of the domestic violence incident, it is unlikely that the juvenile court would have changed its view regarding the destruction of the parent-child relationships. *See* Utah Code Ann. § 78A-6-507(1)(e); *In re M.L.*, 965 P.2d at 561–62 (instructing that in considering a failure of parental adjustment, the court must weigh a parent's present ability evidence "in light of the parent's past conduct and its debilitating effect on the parent-child relationship").

¶41    Father also suggests that his trial counsel's performance was prejudicial because trial counsel elicited testimony about Father's financial condition and Father's earlier physical discipline of another child that "then served as grounds for termination." But even without the testimony elicited by Father's counsel about Father's finances, the State introduced evidence that Father was employed yet had paid no child support since the time the Children were taken into DCFS custody. Thus, Father's testimony may not have been helpful, but Father has not shown that without it the court was reasonably likely to find that Father had made more than token efforts to financially support the Children. *See* Utah Code Ann. § 78A-6-507(1)(f).[7] As to Father's physical discipline of another child, the court made a finding that this incident had occurred seven years earlier. But this finding does not appear to have played a significant role in the court's decisions regarding the grounds for termination. The

---

7. Father also has not shown that even if the evidence his counsel elicited on his finances led to a finding of token efforts, its omission from trial likely would have led the court to reject the other four grounds supporting termination.

court did not mention it again and instead repeatedly emphasized the destructive effect Father's neglect and inaction had on the Children. Given the totality of the circumstances, it is not reasonably likely that the court would have viewed Father and his relationship with the Children any differently had counsel not introduced these two pieces of evidence.

¶42 Additionally, our own review of the record indicates that Father was not prejudiced by his trial counsel's performance. The court understood and analyzed the facts, most of which are unchallenged on appeal. In a detailed written decision, the court carefully applied the correct law and was not misled by any confusion that trial counsel may have had. Despite Father's strides, the court still had numerous concerns about Father, and its decision to terminate Father's parental rights was driven largely by Father's own untimely efforts to engage in services.

¶43 Indeed, termination for failure of parental adjustment is well supported in the evidence. Citing Utah Code section 78A-6-507(1)(e), the court found that Father was "unable or unwilling within a reasonable time to substantially correct the circumstances, conduct or conditions that led to the placement of [the Children] outside of" his home. Although DCFS provided reasonable and appropriate reunification services to Father, Father did not take the various services seriously for almost a year. *See infra* ¶¶ 46–49. For example, Father did not comply with the drug-testing requirement for more than eleven months—around two months before the second permanency hearing. He also "purposely refused" multiple times to allow DCFS to inspect his home until after services were terminated. And even when DCFS "made a push to return" the Children to Father, he "showed little interest" in the attempts to reunify. *Cf. In re C.Z.*, 2021 UT App 28, ¶ 24 (affirming the juvenile court's conclusion that "the father's efforts were far too little far too late" (cleaned up)). Importantly, Father's delay caused damage to his parent-child relationships with both of the Children.

¶44 Furthermore, Father largely ignored the court's no-contact order with Mother, and he had "chosen to remain" in a volatile relationship with her—a relationship that involved domestic violence. Given that the Children were removed after a domestic violence incident, Father's refusal to distance himself from Mother showed his unwillingness to correct the circumstances that led to the Children's removal. *Cf. id.* ¶¶ 25–26 ("The father's choice to remain involved with the mother—whether romantically or as a co-parent—placed the child at continued risk."). In light of this strong evidence that Father exhibited a failure of parental adjustment, we conclude that it is unlikely that trial counsel's performance had any impact on the court's findings or conclusion on this ground for termination. In other words, even if counsel had performed more effectively in the ways Father identifies, it is not reasonably likely that the court would not have found at least one ground upon which to base its termination of Father's parental rights.

¶45 In short, our confidence in the outcome of this case is not undermined by any of trial counsel's perceived shortcomings. Father's claims of ineffective assistance are therefore unavailing.

## II. Reunification Efforts

¶46 Next, Father contends that DCFS did not provide reasonable reunification services to him and that the juvenile court erred in finding to the contrary. Father asserts that despite knowing he needed help with his parenting skills given A.H.'s disabilities and N.H.'s attachment issues, DCFS did not provide additional support "until it was too late." In particular, Father points out that the PCCIT sessions began during an extension period for reunification services and only one month before the second permanency hearing, at which the court terminated services. He further argues that DCFS's efforts were unreasonable because its delay in providing PCCIT until he was "up against the permanency deadline" limited his success in the

time allotted and "virtually assured termination of reunification services."

¶47    "Generally, as long as DCFS has made a fair and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights, [DCFS] has complied with its statutory obligation." *In re A.W.*, 2018 UT App 217, ¶ 29, 437 P.3d 640 (cleaned up). But the process of reunification is recognized as "a two way street which requires commitment on the part of the parents, as well as the availability of services from the State." *In re K.K.*, 2017 UT App 58, ¶ 5, 397 P.3d 745 (per curiam) (cleaned up). Reunification services ordinarily last twelve months after a child's removal, but the juvenile court may, under certain conditions, extend services for up to 180 days. Utah Code Ann. § 78A-6-314(6)–(7) (LexisNexis 2018). Ultimately, "reasonableness is an objective standard that depends upon a careful consideration of the facts of each individual case," and the juvenile court thus has "broad discretion in determining whether DCFS made reasonable efforts to reunify" a parent with a child. *In re K.K.*, 2017 UT App 58, ¶ 5 (cleaned up); *accord In re A.W.*, 2018 UT App 217, ¶ 29.

¶48    Here, DCFS provided numerous services to Father for more than a year, including drug testing, substance abuse treatment, psychological evaluation, domestic violence treatment, anger management classes, parenting classes, and weekly supervised visitation with the Children. The juvenile court extended these services, and it found that Father "actually engaged in the services," knew what services needed to be completed, and "knew what was expected" of him. Yet Father, by his own fault, "took a lackadaisical approach to completing the services on time because he was relying on [Mother] to get the [C]hildren back." The caseworker's "[c]ajoling" at visits had "little effect" on Father. As discussed, DCFS's provision of services is "a two way street which requires commitment on the part of the parents." *In re K.K.*, 2017 UT App 58, ¶ 5 (cleaned up).

But the court found that Father "did not take reunification services seriously for nearly a year." While DCFS's provision of various services and attempts to help Father were reasonable, Father bore the responsibility of participating in and completing those services, and it was Father's "lackadaisical" and belated efforts that fell short.

¶49  Father also complains that DCFS unreasonably delayed PCCIT, especially when the juvenile court found that the therapy "could have been provided earlier." But Father overlooks that the court also found that PCCIT "was limited because the initial parenting class was not successful, even according to [Father]." Given Father's lack of progress in parenting class and his overall lack of timely efforts, we cannot say that DCFS's services were unreasonable under the circumstances. We thus reject this challenge to the court's decision.

## III. Grounds for Termination

¶50  Finally, Father asserts that the juvenile court erred in terminating his parental rights on the ground of unfitness. He suggests that this ground is unsupported by the evidence because he had made significant progress by the time of trial and the court had returned Am.H. to his care. He also claims that the court erroneously deemed him an unfit parent when he merely failed to be a "model parent." *See generally* Utah Code Ann. § 78A-6-503(4) (LexisNexis 2018) (stating that a parent's fundamental liberty interest "does not cease to exist simply because a parent may fail to be a model parent").

¶51  To the extent that Father pursues a sufficiency of the evidence challenge, he has not carried his burden on appeal. Although he discusses unfitness and mentions neglect, he has not undertaken an analysis of each ground supporting the court's termination decision. "And we will not reverse a ruling of a lower court that rests on independent alternative grounds

where the appellant challenges less than all of those grounds." *In re J.M.*, 2020 UT App 52, ¶ 30, 463 P.3d 66 (cleaned up).

¶52   To the extent Father believes that the court terminated his rights based solely on his failure to be a model parent, we are not persuaded. The court made detailed findings in support of five grounds for termination, and this case involves much more serious problems than Father's mere failure to be a model parent. Thus, we reject Father's challenge to the grounds for termination.

CONCLUSION

¶53   Father has not shown that he was prejudiced by his trial counsel's performance, and we therefore reject his claims of ineffective assistance of counsel. Father also has not established error in the juvenile court's decisions regarding DCFS's reasonable efforts and the grounds for termination. Accordingly, we affirm the court's decision terminating Father's parental rights as to A.H. and N.H.

_____