**2022 UT App 130**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF S.T., Z.T., AND J.P.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

K.S.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20220029-CA
Filed November 17, 2022

Eighth District Juvenile Court, Vernal Department
The Honorable Ryan B. Evershed
No. 1175935

Sheleigh A. Harding, Attorney for Appellant

Sean D. Reyes, John M. Peterson, and Joseph A.
Stewart, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this
Opinion, in which JUDGE GREGORY K. ORME and SENIOR JUDGE
KATE APPLEBY concurred.[1]

CHRISTIANSEN FORSTER, Judge:

¶1 Following a bench trial, the juvenile court entered an order
terminating K.S.'s (Mother) parental rights to her children, J.P.,
S.T., and Z.T. (collectively, the Children). Mother contends the
court erred in determining the State made reasonable efforts to

---

1. Senior Judge Kate Appleby sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

provide reunification services to her and in concluding termination of her parental rights was in the best interest of the Children. Because Mother has not persuaded us that the juvenile court committed reversible error, we affirm its order terminating Mother's parental rights.

BACKGROUND[2]

¶2     Mother is the biological mother of all three children. In March 2014, the biological father of the two oldest children died. After his death, Mother began a relationship with R.P. (Father), who is the biological father to the youngest child.

¶3     Mother and Father have a history of illegal drug use, substance abuse, and domestic violence. In June 2019, they were involved in a domestic violence incident that took place in front of the Children. In response, the Division of Child and Family Services (DCFS) filed a petition seeking protective supervision services. In August 2019, the juvenile court adjudicated the Children as abused and neglected by Mother and Father; the Children were placed under the protective supervision of the State but were not removed from the home. The court ordered DCFS to provide protective supervision services to the family and to work with Mother and Father to create a Child and Family Plan (the service plan). Mother and Father also were ordered to "remain drug and alcohol free."

¶4     DCFS prepared the service plan "with the input of the parents." A disposition hearing was held in September 2019, during which the juvenile court reviewed the service plan and

---

2. "We recite the facts in the light most favorable to the juvenile court findings." *In re J.M.*, 2020 UT App 52, n.1, 463 P.3d 66 (quotation simplified).

determined that the services offered by DCFS constituted "reasonable efforts" on the part of DCFS.

¶5      The Children remained under in-home protective custody from August 2019 until February 2020. During that time, the court held three review hearings. At each of these hearings, the court found that "DCFS had made reasonable efforts to provide services and finalize" the service plan. However, Mother and Father were continually non-compliant with the service plan. The couple had engaged in another physical fight in the presence of the Children, and each had relapsed into using methamphetamine and refused drug testing.

¶6      In February 2020, Mother was arrested for driving under the influence with the Children in the vehicle. Following Mother's arrest, the guardian ad litem filed a Motion for Expedited Placement and Temporary Custody. At a shelter hearing on the motion, the juvenile court removed the Children from Mother and Father's custody and placed them in the temporary custody of DCFS.

¶7      In March 2020, DCFS filed a new Child and Family Plan (the Plan). The juvenile court held a second disposition hearing, during which it found that Mother, Father, and DCFS had worked together to create the Plan that would address the issues in the case. Among other things, the Plan required that Mother and Father (1) remain drug and alcohol free, (2) participate in random drug testing, (3) attend NA/AA or any other approved group meetings on a weekly basis, (4) complete a substance abuse and mental health assessment and follow the resulting recommendations, (5) have no new convictions or arrests and work to resolve any current charges, (6) establish gainful employment and maintain stable housing for the Children, (7) notify DCFS of any changes in living arrangements, (8) maintain regular contact with their DCFS caseworker, (9) attend all family team meetings and court hearings,

(10) complete parenting classes recommended by DCFS, (11) attend a trauma-informed parenting class, and (12) work with Family First or Peer Parenting to establish additional parenting skills. The court adopted the Plan, concluding that the reunification services outlined in the Plan constituted "reasonable efforts" by DCFS.

¶8    DCFS continued to provide reunification services to Mother and Father until February 2021. During the period when services were provided, the juvenile court held regular review hearings. At the conclusion of each hearing, the court specifically found that "DCFS had made reasonable efforts to provide services."

¶9    In February 2021, the court convened a permanency hearing. During the hearing, the court found that "[r]easonable efforts were made by DCFS . . . to provide services and finalize the [Plan] and its permanency goal of reunification," but "[t]he parents have failed to participate in, to comply with . . . , or to meet the goals of" the Plan. As a result, the court terminated all reunification services and changed the Children's primary permanency goal to adoption.

¶10    Thereafter, the State filed a Petition for Termination of Parental Rights. A two-day trial on the petition was held in October and November 2021, at the close of which the court found that the State had proved multiple statutory grounds for termination. The court then evaluated whether termination of Mother's parental rights was in the Children's best interest. On this point, the court made sixteen findings. Among other things, the court considered that the Children had been residing with the foster parents since November 2020. The court found that during that time, the Children and the foster parents "developed bonds of love and affection"; the Children "integrated into the home with the foster parents"; the foster parents "cared for the [C]hildren's emotional, physical and mental needs"; and the

Children "look to the foster parents for parental guidance, love, and affection." Overall, while in the foster parents' home, the Children developed "much greater emotional ties with the foster parents than with Mother," had made "remarkable strides . . . both emotionally and physically," and "went from struggling academically and emotionally to thriving in both areas."

¶11   In comparison, the court found that Mother was "unwilling or unable" to take steps to "improve the [C]hildren's lives and ability to function in society" or to "care[] for the [C]hildren's emotional, physical and mental needs." Visitation with Mother had negatively affected the Children. Following parent time, they "would act out in sexual ways and act in a violent manner." However, after the court discontinued parent time, "all the significant behavioral issues stopped." Finally, the court recognized that although Mother had made "some recent efforts to adjust her circumstances, conduct, and conditions," these recent efforts, which "were made over two years after the initial in-home case was opened," were not "sufficient to make it in the Children's best interest to . . . return them to her care."

¶12   Based on these findings, the juvenile court concluded it was in the best interest of the Children to terminate Mother's parental rights so the Children could be adopted by the foster parents.

¶13   The juvenile court also determined it was "strictly necessary" to terminate Mother's parental rights to facilitate that adoption. During the court's oral ruling at the termination hearing, it explained that it considered alternative placement options before concluding it was strictly necessary to terminate Mother's parental rights. Specifically, the court considered placement with Mother, Father, and Mother's family. However, because the Children could not be safely returned at that time to any of those individuals, "the only options" left would be to "terminate parental rights" or to "place [the Children] in the

permanent custody and guardianship of the foster parents." The court memorialized this explanation in its written ruling, stating that prior to its strictly necessary determination, it "considered other options for the [C]hildren including placement with a family member, guardianship with foster parents, and returning the [C]hildren to Mother and/or [Father]." However, "adoption with the foster parents" would best "satisf[y] the [C]hildren's need for safety, stability, and permanency."

## ISSUES AND STANDARDS OF REVIEW

¶14   Mother now appeals the juvenile court's order terminating her parental rights and raises two issues for our review. First, Mother argues the juvenile court erred in concluding DCFS made reasonable efforts to reunite her with the Children. "A court's determination that DCFS made reasonable efforts to provide reunification services involves an application of statutory law to the facts that presents a mixed question of fact and law, requiring review of the juvenile court's factual findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." *In re N.K.*, 2020 UT App 26, ¶ 15, 461 P.3d 1116 (quotation simplified). However, Mother acknowledges that she did not raise this argument below, and she therefore asks us to review the court's reasonable-efforts finding for plain error. In other words, she asks us to conclude that the reunification services provided by the State were so obviously insufficient that the court should have been aware of the deficiencies and plainly erred in concluding that DCFS had made reasonable efforts. To succeed on a claim of plain error, Mother must show that "(1) an error exists; (2) the error should have been obvious to the [juvenile] court; and (3) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome." *See In re J.A.L.*, 2022 UT 12, ¶ 12, 506 P.3d 606 (quotation simplified).

¶15    Second, Mother argues the juvenile court abused its discretion in determining that terminating her parental rights was in the best interest of the Children. "The best interest inquiry is a fact-like mixed determination of law and fact that is subject to deferential review." *Id.* ¶ 17 (quotation simplified). "The juvenile court's best interest analysis may be set aside if it is against the clear weight of the evidence." *Id.* (quotation simplified).[3]

ANALYSIS

I. Reasonable Efforts

¶16    Mother first argues the juvenile court erred in determining that the State made reasonable efforts to provide services that would help her resolve her parenting deficiencies and allow her to regain custody of the Children. In particular, Mother contends DCFS did not provide her with domestic violence services or sufficient mental health services, which were needed to address the "central issues" in this case. Mother concedes that she did not challenge the court's reasonable-efforts determination below and asks us to review its conclusion for plain error. Thus, to succeed on this claim, Mother must show that a harmful error exists and

---

3. Mother also argued the juvenile court erred in weighing her past parental fitness with her current parental fitness, and that the evidence was insufficient to support the court's finding that statutory grounds existed to terminate her parental rights. As part of this argument, Mother asked us to overturn this court's recent decision in *In re J.M.*, 2020 UT App 52, 463 P.3d 66. However, during oral argument before this court, Mother conceded that this case does not directly implicate the holding in *In re J.M.* and therefore withdrew her challenge as to this issue.

that the error should have been obvious to the juvenile court. *See In re J.A.L.*, 2022 UT 12, ¶ 12, 506 P.3d 606.[4]

¶17 When the juvenile court orders DCFS to provide reunification services to a parent, the court must find that "reasonable efforts" were made to provide those services before the court may terminate the parent's rights. Utah Code Ann. § 80-4-301(3)(a) (LexisNexis Supp. 2022). "A reasonable effort is a fair

---

4. Utah appellate courts have recently questioned whether plain error review applies in civil cases. *See, e.g.*, *Cove at Little Valley Homeowners Ass'n v. Traverse Ridge Special Service Dist.*, 2022 UT 23, ¶¶ 36–44, 513 P.3d 658; *Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶¶ 28–44, 507 P.3d 357. In *Kelly*, this court concluded that "unless expressly authorized by rule, the plain error exception to our preservation rule does not properly extend to *ordinary* civil appeals." 2022 UT App 23, ¶ 41 (emphasis added) (citation omitted). The court noted, however, "that some civil cases involve significant interests on par with those at issue in criminal cases, such as . . . termination of parental rights," but stopped short of determining whether plain error should apply in such cases. *Id.* ¶ 42 n.10; *see also Cove*, 2022 UT 23, ¶ 40 n.5 ("There may be civil cases where the interests implicated—parental termination cases, for example—present a compelling argument for plain error review.").

    In this case, although Mother raises a claim of plain error, none of the parties have challenged the application of plain error review in the context of a parental rights termination proceeding, and the matter has not been briefed for our review. Accordingly, we do not rule on the propriety of the plain error doctrine in termination cases generally. Moreover, "even if the doctrine of plain error does apply, [Mother] has failed to establish plain error." *See In re J.A.L.*, 2022 UT 12, ¶ 12 n.3, 506 P.3d 606. Therefore, "we simply hold that [Mother] has not carried her burden of showing plain error." *See id.*

and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights." *In re K.F.*, 2009 UT 4, ¶ 51, 201 P.3d 985 (quotation simplified). "Reasonableness is an objective standard that depends upon a careful consideration of the facts of each individual case." *In re A.W.*, 2018 UT App 217, ¶ 29, 437 P.3d 640 (quotation simplified). Because reasonableness determinations are fact-intensive, we afford the juvenile court "broad discretion in determining whether reasonable reunification efforts were made." *In re K.F.*, 2009 UT 4, ¶ 52. "Generally, as long as DCFS has made a fair and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights, [DCFS] has complied with its statutory obligation." *In re A.W.*, 2018 UT App 217, ¶ 29 (quotation simplified).

¶18 Here, at the second disposition hearing in March 2020, DCFS was ordered to provide reunification services to Mother. Prior to the hearing, Mother and DCFS worked together to create the Plan, which would address the issues in the case. And at the disposition hearing, Mother asked for additional amendments to the Plan, which the court approved. As amended, the Plan required, among other things, that Mother remain drug and alcohol free and participate in random drug testing, complete a substance abuse and mental health assessment and follow the resulting recommendations, have no new convictions or arrests, establish gainful employment and maintain stable housing, notify DCFS of any changes in living arrangements, and maintain regular contact with her DCFS caseworker. The court reviewed the Plan and concluded that the reunification services outlined in it constituted "reasonable efforts" by DCFS.

¶19 Mother has not met her burden on appeal to demonstrate that the omission of domestic violence services from the Plan and more robust mental health services would have been an obvious oversight that the court should have identified and remedied, and she therefore cannot show the juvenile court erred in concluding

that the State made reasonable efforts. First, despite domestic violence services not being required by the Plan, DCFS in fact provided such services. For example, at trial, Mother's DCFS caseworker testified that the in-home services included services to deal with Mother and Father's domestic violence incidents. And Mother and her DCFS caseworker had "multiple" conversations in which they discussed options about how Mother could leave Father, including that Mother could move into a women's shelter. Mother's caseworker also discussed with her the possibility of reaching out to work with a victim advocate. Eventually, Mother decided to go to the shelter, at which point her caseworker transported her there. Once at the shelter, Mother received treatment, "broke[] up" with Father, and obtained a protective order against him. Nevertheless, Mother continued to spend time with Father, visiting his home "multiple times" and eventually moving back into the same home.

¶20 Second, Mother's claim that because of insufficient mental health services, her "mental health issue"—bipolar II disorder—"was not timely discovered and was never treated" is not supported by the record. The Plan, which Mother helped to draft and agreed to comply with, required that she complete a substance abuse and mental health assessment and follow up with the recommendations from the assessment. Despite Mother's agreement to follow the Plan, she was inconsistent in attending therapy throughout the case. From the start of the case, Mother's group therapy attendance was "[i]ntermittent." And although Mother's individual therapy attendance at the beginning of the case was "pretty consistent," there were periods when her therapist "didn't hear from her or see her," including a six-month period from June 2020 to December 2020. Then, in December 2020, Mother "re-engaged in therapy." Approximately two months later, in February 2021, she was diagnosed with bioplar II disorder. Following her diagnosis, Mother began taking

medication and increased the frequency with which she attended therapy.

¶21 Moreover, even if there were additional domestic violence services or more robust mental health services offered that could have assisted in reunification, Mother did not request either of these things even though she had multiple opportunities to do so; therefore, their omission cannot be considered obvious. *See In re J.A.L.*, 2022 UT 12, ¶ 12. Mother and DCFS worked together to formulate the Plan, which was put in place to address all the issues that led to the Children's removal and prevented Mother from being a fit parent. During this process, Mother indicated to DCFS that domestic violence was no longer an aspect of her relationship with Father. The juvenile court examined the Plan at the second disposition hearing and without any objection from Mother, approved it, finding that it constituted reasonable efforts by DCFS. Following its adoption, the court reviewed the Plan at least seven times and concluded during each review that DCFS had engaged in reasonable efforts to provide services. At no point did Mother object to the court's findings or indicate that she needed additional or different services. Mother's "complaints about what [she] considers to be insufficient help from DCFS should have been brought to the attention of the juvenile court to address before the termination trial." *See In re N.K.*, 2020 UT App 26, ¶ 20, 461 P.3d 1116; *see also In re A.W.*, 2018 UT App 217, ¶ 31 (affirming a finding of reasonable efforts where the father ignored "several times in the record in which the juvenile court made an unchallenged periodic finding—before its termination order— that DCFS had made reasonable efforts to provide him with reunification services"); *In re A.C.*, 2004 UT App 255, ¶ 17, 97 P.3d 706 ("The State has the obligation to make reasonable efforts, but it is the parent's responsibility to demand services if they are not offered prior to the termination hearing." (quotation simplified) (quoting *In re G.C.*, No. 02-0307, 2002 WL 535453, at *2 (Iowa Ct. App. Apr. 10, 2002))). In light of Mother's participation in drafting

the Plan and her failure to notify the court that she needed additional or different services or to object to the court's interim findings that DCFS was making reasonable efforts to reunify Mother and the Children, we cannot conclude that the court's determination was in error, much less that any error would have been obvious.

¶22 Finally, beyond arguing that an obvious error existed, Mother has not demonstrated how any alleged errors were harmful. The record is replete with evidence that Mother failed to comply with the Plan. In the order terminating Mother's parental rights, the juvenile court found, among other things, that (1) "Mother continued to use illegal drugs throughout the case and failed to fully participate in the drug testing as required"; (2) "Mother never had a significant period of time where she called in for testing, tested clean, and otherwise demonstrated that she was able to stay clean and sober"; (3) "Mother failed to be consistent with her substance abuse therapy during the case"; (4) Mother had "several interactions with law enforcement, including convictions and arrests"; (5) "Mother was an active participant in many of the [domestic violence] incidents" with Father and she "continued to reside with him or returned to a relationship with him"; (6) "Mother failed to establish a stable and appropriate home for the [C]hildren"; (7) "Mother failed to update DCFS of any change in living conditions throughout the case"; (8) "visitation with the [C]hildren was at times inconsistent or non-existent"; (9) Mother "failed to attend all hearings and family team meetings as required"; and (10) "Mother failed to complete a parenting class, or the Trauma-informed parenting class." Because Mother has not shown how additional domestic violence services or mental health services would have prevented any of the foregoing failures, she has not persuaded us that she was prejudiced by any alleged error.

¶23 In sum, "the process of reunification is recognized as a two way street which requires commitment on the part of the parents,

as well as the availability of services from the State." *In re A.H.*, 2021 UT App 57, ¶ 47, 493 P.3d 81 (quotation simplified). Here, DCFS offered Mother domestic violence services, and the delay in Mother's diagnosis of bipolar II disorder was not the result of DCFS's failure to provide adequate mental health services but was instead the result of Mother not attending therapy for a six-month period. "While DCFS's provision of various services and attempts to help [Mother] were reasonable, [Mother] bore the responsibility of participating in and completing those services . . . ." *Id*. ¶ 48. Accordingly, the juvenile court did not err in concluding that DCFS made reasonable efforts to provide reunification services to Mother.

## II. Best Interest of the Children

¶24 Next, Mother argues the juvenile court abused its discretion in concluding that termination of her parental rights was in the best interest of the Children. Mother contends the court's best interest analysis was "conclusory and clearly inadequate" inasmuch as the court did not assess whether there were placement options for the Children other than adoption.

¶25 "Because the relationship between parent and child is constitutionally protected, a court may only terminate parental rights upon a finding that termination is strictly necessary to the best interests of the child."[5] *In re N.K.*, 2020 UT App 26, ¶ 23, 461

---

5. To terminate a parent's rights, Utah law requires that both elements of a two-part test are satisfied. "First, the court must find that one or more of the statutory grounds for termination are present. Second, the court must find that termination of the parent's rights is in the best interests of the child." *In re N.K.*, 2020 UT App 26, ¶ 21, 461 P.3d 1116 (quotation simplified). Here, Mother challenged the court's determination that statutory grounds for termination are present. However, during oral

(continued…)

P.3d 1116 (quotation simplified). In a case in which the child is not in the parent's physical custody, the court conducting the best interest analysis must address certain specific considerations. *See* Utah Code Ann. § 80-4-303(1) (LexisNexis Supp. 2022); *see also In re J.A.L.*, 2022 UT 12, ¶ 20, 506 P.3d 606. These specific considerations include "the physical, mental, or emotional condition and needs of the child and the child's desires regarding the termination"; "the effort the child's parent or parents have made to adjust the parent's or parents' circumstances, conduct, or conditions to make it in the child's best interest to return the child to the child's home"; and "any other factor that the juvenile court considers relevant." Utah Code Ann. § 80-4-303(1); *see also In re J.A.L.*, 2022 UT 12, ¶ 20.

¶26　Moreover, as part of the best interest analysis, the court must "determine if termination is strictly necessary." *In re B.T.B.*, 2020 UT 60, ¶ 55, 472 P.3d 827. This inquiry "requires courts to explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights." *Id.* ¶ 67 (quotation simplified). The court must assess whether an alternative arrangement, such as a permanent guardianship, "can equally protect and benefit the children in the case before it." *In re J.A.L.*, 2022 UT 12, ¶ 25 (quotation simplified). That assessment "requires analysis of the particularized circumstances of the case" and cannot be satisfied merely by the "categorical concern that a

---

argument before this court, Mother conceded that the caselaw on which she based her challenge did not apply here and accordingly withdrew her challenge to the court's statutory grounds determination. *See supra* note 3. As a result, we do not address the court's conclusion that there are statutory grounds for termination and instead focus only on the court's best interest determination.

permanent guardianship is not as stable or permanent as an adoption." *Id.*

¶27 Citing *In re J.A.L.*, Mother contends the juvenile court's best interest analysis was "conclusory and clearly inadequate." In support, Mother points to the court's finding that adoption by the foster parents would best "satisf[y] the [C]hildren's need for safety, stability, and permanency," and argues the court "did not analyze the particular circumstances of the case" but instead reached a "bare and summary conclusion" that "adoption is more safe, stable and permanent than permanent custody and guardianship." Mother's argument is unavailing.

¶28 First, Mother mischaracterizes the juvenile court's best interest findings. In conducting the best interest analysis, the court correctly analyzed the Children's needs and determined that terminating Mother's parental rights was strictly necessary and in their best interest. Because the Children were not in Mother's custody at the time of the termination hearing, the court analyzed the "specific considerations" listed in Utah Code section 80-4-303(1), as well as the availability of other feasible custody options. *See id.* ¶¶ 20, 24.

¶29 As to the first specific consideration, the court examined "the physical, mental, or emotional condition and needs" of the Children. *See* Utah Code Ann. § 80-4-303(1)(a). The court found that while the Children were living with the foster parents, they made "remarkable strides . . . both emotionally and physically" and "went from struggling academically and emotionally to thriving in both areas." The Children and the foster parents "developed bonds of love and affection for one another," and the Children developed "much greater emotional ties with the foster parents than with Mother." The foster parents "cared for the [C]hildren's emotional, physical and mental needs," and in turn the Children "look to the foster parents for parental guidance, love, and affection." In addition, the court noted that parent time

with Mother had negatively affected the Children; following visits with Mother, the Children "would act out in sexual ways and act in a violent manner." However, after the court discontinued the parent time, "all the significant behavioral issues stopped."

¶30 Next, the court considered the effort Mother made to adjust her "circumstances, conduct, or conditions" to make it in the Children's best interest to return to her custody. *See id.* § 80-4-303(1)(b). The court recognized that Mother had made "some recent efforts to adjust her circumstances, conduct, and conditions" but ultimately determined that her efforts, which "were made over two years after the initial in-home case was opened," were not "sufficient to make it in the Children's best interest to . . . return them to her care."

¶31 Based on these findings, the court concluded it was in the best interest of the Children to terminate Mother's parental rights. And after "consider[ing] other options for the [C]hildren including placement with a family member, guardianship with foster parents, and returning the [C]hildren to Mother and/or [Father]," the court concluded that in this case, "adoption with the foster parents" would best "satisf[y] the [C]hildren's need for safety, stability, and permanency." Accordingly, the court found it "strictly necessary to terminate . . . [Mother's] parental rights so the [C]hildren may be adopted and receive the permanency they deserve."

¶32 In sum, the juvenile court carefully conducted its best interest analysis in compliance with the relevant statutory provisions and current caselaw. Mother's assertion that the court "did not analyze the particular circumstances of the case" mischaracterizes the court's findings because it selectively addresses only one finding while ignoring the other fifteen, and Mother has not grappled with the court's other findings supporting the conclusion that adoption is preferable in this case. When considered as a whole, the findings demonstrate that the

court satisfied its duty to analyze the particular circumstances of the case and to assess the feasibility of placement options other than adoption for the Children.[6]

## CONCLUSION

¶33    Mother has not shown that the juvenile court clearly erred in determining that DCFS made reasonable efforts to provide reunification services, nor has she shown that the court's best interest determination was against the clear weight of the evidence. Accordingly, we affirm the juvenile court's order terminating Mother's parental rights.

---

6. In cases such as this in which children have developed strong emotional ties with their foster parents and alternative placement options—such as a permanent guardianship—do not exist, the juvenile court may properly determine that termination of the parent's rights is strictly necessary and in the children's best interest. Where only one feasible custody option exists, the "categorical concern" that adoption is more stable than a permanent guardianship is not implicated. *See In re J.A.L.*, 2022 UT 12, ¶ 25; *see also In re D.G.*, 2022 UT App 128, ¶ 8 n.2 (reasoning that where the juvenile court "was not presented with any feasible option for a guardianship placement," the juvenile court's finding that "termination of [the mother's] rights was strictly necessary" was not against the clear weight of the evidence). Put simply, where only one option exists, the court has nothing to weigh.