2023 UT App 95

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF M.M.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

A.M.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20220624-CA
Filed August 24, 2023

Second District Juvenile Court, Ogden Department
The Honorable Jeffrey J. Noland
No. 1140984

Emily Adams, Sara Pfrommer, and Hannah K.
Leavitt-Howell, Attorneys for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Following a multi-day bench trial, the juvenile court entered an order terminating A.M.'s (Mother) parental rights to her child, M.M. (Child). Mother contends the court erred in denying her reunification services and in concluding termination of her parental rights was strictly necessary. Because Mother has not persuaded us that the court committed reversible error, we affirm its order terminating Mother's parental rights.

*In re M.M.*

## BACKGROUND[1]

¶2 Mother is the biological parent of three children: Child, born in 2015; A.M. (Sister), born in 2018; and B.B. (Brother), born in 2019. All three children have different biological fathers. This appeal concerns only Child. Nevertheless, a complete understanding of the events giving rise to this case necessitates a recounting of the background as it relates to all three children.

¶3 In December 2016, prior to the birth of Sister and Brother, Child's maternal grandmother (Grandmother) and maternal step-grandfather (Grandfather) noticed "large bruises on [Child's] hips and thighs when they put him into the bath." The following day, a caseworker from the Division of Child and Family Services (DCFS) met with Grandmother and Grandfather and examined Child. The caseworker observed the same bruising on Child that had been seen the day before, as well as a "small bruise in [Child's] hairline above his forehead." Child was transported to the hospital where a doctor observed the bruising and opined that "the bruising is concerning for abuse because of its location, linear component, the large size, and the lack of history explaining them."

¶4 A few months later, in February 2017, Child was brought to the hospital for a breathing treatment for his asthma. While at the hospital, a doctor again observed "linear bruising on [Child's] buttocks," which she described as a "classic bruise found with spanking or inflicted trauma." She explained the bruising was consistent with "excessive," "repeated high-force spanking."

---

1. "We recite the facts in the light most favorable to the juvenile court findings." *In re S.T.*, 2022 UT App 130, n.2, 521 P.3d 887 (quotation simplified).

¶5 During the time of these injuries, Child had been residing with Mother, Mother's husband (Stepfather),[2] Grandmother, and Grandfather, and he had also attended daycare. Ultimately, no one was able to provide an explanation for the bruising. As a result, the juvenile court concluded that Child "has been abused by an unknown perpetrator" and adjudicated him dependent as to Mother. The court allowed Child to remain with Mother, contingent on her compliance with a safety plan and completion of court-ordered services. In December 2017, after Mother had received a year of services, the court terminated its jurisdiction and returned permanent custody and guardianship of Child to Mother.

¶6 The following month, Sister was born. Brother was born a year and a half later.

¶7 In August 2019, Brother suffered a series of abusive episodes. First, Mother said she "fell going down some stairs" while holding Brother. Thereafter, Brother's father picked Brother up from a babysitter and became concerned that Brother was vomiting and appeared dehydrated. Brother was taken to the doctor for examination but was sent home with his father because the cause of the vomiting was "undetermined." A few weeks later, Brother's father again observed that Brother had been vomiting and appeared dehydrated. Brother was taken to the hospital for examination.

¶8 Upon examination, Brother's head appeared "swollen." A subsequent CT scan revealed a "large" brain bleed and a skeletal survey revealed "multiple healing rib fractures." A doctor evaluated Brother the following day and expressed that Brother's

---

2. Stepfather and Mother married one day after DCFS made the initial home visit to observe Child. Prior to the marriage, Stepfather spent "multiple nights in a row" in the home with Mother and Child.

initial vomiting was "consistent with the brain injury" and a "sign" that the brain injury had occurred. She noted that although Brother's head circumference had not been measured during his initial visit to the doctor, by the time of his second visit—which occurred approximately two weeks later—Brother "had a massive head." She also opined that Brother's injuries were caused by one of his caregivers and were "consistent with inflicted trauma and child abuse." When questioned, both parents denied any involvement or knowledge of injuries to Brother. However, based on her conversation with both parents, the doctor had "much more concern" that Mother had caused Brother's injuries.

¶9 Based on Brother's injuries, the State filed a verified petition for custody and guardianship on behalf of all three children in August 2019. In the petition, the State asked the juvenile court to find that "[Brother] is severely abused by [Mother]" and that Child and Sister were "siblings at risk" and "neglected" as to Mother.

¶10 Over the next several months, the juvenile court transferred temporary custody of Sister and Brother to their respective fathers. Although the State requested that Child be removed from Mother's custody, the court allowed Child to remain home with Mother on the condition that she comply with a safety plan. The safety plan required "line of sight supervision" by Grandmother and Grandfather for "any contact" between Mother and Child. But Mother did not abide by the safety plan, and in January 2020, after a DCFS caseworker observed a series of three events of non-compliance, the court transferred Child to DCFS's custody, finding that Mother had "substantially endangered" Child's welfare. Child was then placed in a foster care home.

¶11 In July 2020, Mother appeared before the juvenile court for adjudication of the State's verified petition for custody.[3] After negotiations with Mother, the State agreed to amend the petition by removing the allegation that Mother had severely abused Brother, replacing it with an allegation that Brother suffered "severe physical abuse while in the care of [Mother]." Following this amendment, Mother proceeded with adjudication and entered a plea pursuant to rule 34(e) of the Utah Rules of Juvenile Procedure by which she neither admitted nor denied the allegations but they were deemed admitted as a matter of law.

¶12 At the close of the hearing, the court found by clear and convincing evidence that Brother had suffered "severe physical abuse while in the care of [Mother]." Accordingly, the court found that "[Sister] and [Child] are siblings at risk" and were "neglected" as to Mother. In addition to adjudicating the children's statuses, the court also substantiated the DCFS supported finding of severe physical abuse of Brother while in Mother's care. The court ordered that Brother and Sister continue in the temporary custody of their respective fathers and that Child continue in the custody of DCFS.

¶13 Shortly thereafter, the juvenile court held a disposition hearing during which it resolved the custody petition as to Brother and Sister by granting custody and guardianship to their respective fathers and terminating jurisdiction. The court requested briefing on the issue of whether Mother should be provided reunification services for Child. Citing the allegations that Mother physically abused her children, even after receiving

---

3. Although the juvenile court adjudicated Child's status as to Mother in July 2020, the written order was not entered until August 2021—approximately one year after the adjudication hearing. Mother appealed the written adjudication order, arguing that she was deprived of due process by the court's delay in entering the order, but this court affirmed.

court-ordered services, as well as Child's success in his current foster placement, the State and the guardian ad litem (GAL) argued that reunification services were not in Child's best interest and accordingly requested that services not be provided. In September 2020, the court entered an order denying reunification services to Mother.[4] In April 2021, the court set Child's primary permanency goal as adoption with his current foster parents.

¶14   The next month, the State filed a petition to terminate Mother's parental rights to Child. The matter proceeded to an eight-day bench trial that took place in March and April 2022.

¶15   At trial, several therapists who had provided mental health services to Mother testified. All agreed that Mother suffered from trauma and that treatment was needed to address it. These therapists further testified that while Mother had attended some therapy sessions, Mother had either canceled, rescheduled, or failed to attend many of the sessions, and that although Mother had made some progress in therapy, she still had a long way to go to process her trauma.

¶16   Child's therapist and foster parents testified regarding Child's communications with them, as well as Child's

---

4. At the time reunification services for Mother were denied, an Interstate Compact on the Placement of Children (ICPC) request form had been sent to Child's biological father (Father), who resides in South Carolina. Following denial of services for Mother, the juvenile court changed Child's primary permanency goal from reunification with Mother to reunification with Father with a concurrent goal of adoption. During a subsequent permanency hearing, the court terminated reunification services to Father due to his failure to comply with any of the three ICPC requests initiated by DCFS and changed Child's primary permanency goal to adoption with his current foster parents. Father's parental rights to Child were then terminated in June 2022.

improvements since his removal from Mother's custody. Child's therapist explained that Child suffered from "separation anxiety disorder and unspecified trauma and stressor-related disorder" but that these conditions had greatly improved while Child was living with his foster parents. Likewise, Child's foster mother testified that Child had grown emotionally while in her care. She detailed Child's emotional bonds with the members of his foster family and recounted how it was "an easy decision" to pursue adopting Child. Moreover, Child's therapist and foster mother both testified that Child had reported witnessing Mother "hit his sibling on the head" and that Child had also reported that Mother had hit him.

¶17 Following trial, the juvenile court issued an order terminating Mother's parental rights to Child. The court found the testimony and evidence presented to be true, and therefore concluded that the State had proved by clear and convincing evidence three statutory grounds for termination. The court also found that it was in Child's best interest and strictly necessary to terminate Mother's parental rights. In reaching this conclusion, the court noted it had "considered the specific circumstances" of the case, including Child's "wishes to remain in his current foster home" and the feasibility of an alternative to termination, such as a permanent guardianship.

ISSUES AND STANDARDS OF REVIEW

¶18 Mother now appeals the juvenile court's order terminating her parental rights to Child, raising two issues for our review. First, Mother argues the court erred when it refused to order reunification services to her. We review the juvenile court's interpretation of the law for correctness; however, "[t]he ultimate decision whether to provide or deny reunification services is a determination that we review for abuse of discretion." *In re Z.G.*, 2016 UT App 98, ¶ 4, 376 P.3d 1077.

¶19 Second, Mother argues the juvenile court erred when it concluded that termination of her parental rights was strictly necessary. "We review deferentially a lower court's best-interest determination and will overturn it only if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *In re J.J.W.*, 2022 UT App 116, ¶ 18, 520 P.3d 38 (quotation simplified).

## ANALYSIS

### I. Reunification Services

¶20 Mother first argues the juvenile court erred when it denied reunification services to her. Specifically, she contends the court misinterpreted the law and abused its discretion when it (1) failed to provide the "necessary findings for the presumption against reunification services to apply" and (2) improperly weighed the statutory factors a court must use when determining whether to order reunification services.

¶21 After a juvenile court adjudicates a child as abused, neglected, or dependent, the court must conduct a dispositional hearing. *See* Utah Code § 78A-6-311(1) (2020). At that hearing, if the court orders that the child continue in the custody of DCFS, the court shall (1) "establish a primary permanency plan" and (2) "determine whether, in view of the primary permanency plan, reunification services are appropriate." *Id.* § 78A-6-312(2).

¶22 The decision to order reunification services is therefore discretionary with the juvenile court, and "parents have no constitutional right to receive these services." *In re A.K.*, 2015 UT App 39, ¶ 15, 344 P.3d 1153 (quotation simplified); *see also In re N.R.*, 967 P.2d 951, 955–56 (Utah Ct. App. 1998); Utah Code § 78A-6-312(20)(a) (2020). Accordingly, we will overturn the court's

decision only if it "either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *In re E.R.*, 2021 UT 36, ¶ 31, 496 P.3d 58 (quotation simplified).

¶23 In determining whether to order reunification services, the child's "health, safety, and welfare shall be the court's paramount concern." Utah Code § 78A-6-312(5) (2020). And in making this determination, the juvenile court must consider a non-exclusive list of statutory factors, including the following:

- "failure of the parent to respond to previous services or comply with a previous child and family plan;"

- "the fact that the minor was abused while the parent was under the influence of drugs or alcohol;"

- "any history of violent behavior directed at the child or an immediate family member;"

- "whether a parent continues to live with an individual who abused the minor;"

- "any patterns of the parent's behavior that have exposed the minor to repeated abuse;"

- "testimony by a competent professional that the parent's behavior is unlikely to be successful; and"

- "whether the parent has expressed an interest in reunification with the minor."

*Id.* § 78A-6-312(23). However, in cases involving "obvious sexual abuse, sexual exploitation, abandonment, severe abuse, or severe

neglect," the court has no duty to provide services. *Id.* § 78A-6-312(4). And several circumstances—if found by clear and convincing evidence—create "a presumption that reunification services should not be provided to a parent." *Id.* § 78A-6-312(21).

¶24 Before the juvenile court, the State and the GAL argued that reunification services should not be offered to Mother. While only the State argued that the presumption against providing services should apply, both parties argued that the statutory factors weighed in favor of denying reunification services. Ultimately, the court denied services, finding they were not "appropriate" "given the fact that [Mother] had services before."

¶25 Mother takes issue with the juvenile court's determination on two grounds. As an initial matter, she asserts the court made "no findings in its reunification order, much less findings by clear and convincing evidence," that would allow the court to apply the presumption against providing reunification services. But even if Mother's assertion is correct and a presumption against reunification services does not apply in this case, Mother ignores that the court may still properly deny services regardless of whether a presumption exists.[5] And on the facts of this case, the court did not abuse its discretion in concluding that denying reunification services to Mother was appropriate.

---

5. Moreover, Mother's position on this point seems to ignore the juvenile court's own explanation of its reasoning to deny reunification services. At the disposition hearing, the court explicitly agreed with Mother's counsel that Child did not qualify as a "severely abused child," which would create a presumption against providing services. As a result, the court stated, "I don't really attach the presumption that [Mother] should not receive reunification services. I'm kind of looking towards the presumption that she should . . . ."

¶26 Next, Mother asserts the juvenile court improperly weighed the statutory factors a court must consider when determining whether to provide reunification services. According to Mother, "four[6] of the seven factors weigh in favor of granting Mother reunification services" and "the remaining three factors do not tip the balance towards not offering reunification services." We disagree.

¶27 First, Mother contends the juvenile court improperly determined she had failed to respond to reunification services in the past. *See* Utah Code § 78A-6-312(23)(a) (2020) (requiring courts to consider the "failure of the parent to respond to previous services or comply with a previous child and family plan" when determining whether to order reunification services). She claims that the dismissal of the first protective services case in December 2017 and the full restoration of custody of Child shows she responded to services and complied with her previous family plan. But in concluding that this factor weighed against Mother, the court considered Mother's compliance in the first protective services case as well as her actions after that case was closed. The court explained,

> I see that you've had services before on [Child]. We had a [protective supervision services] case. . . . You engage in services. We think things are good. We close the case.

---

6. These factors are (1) "the fact that the minor was abused while the parent was under the influence of drugs or alcohol," (2) "whether a parent continues to live with an individual who abused the minor," (3) "testimony by a competent professional that the parent's behavior is unlikely to be successful," and (4) "whether the parent has expressed an interest in reunification with the minor." *See* Utah Code § 78A-6-312(23)(b), (d), (f), (g) (2020).

> Then not much longer . . . we have a severe abuse to [Child]'s younger sibling . . . . We've already done reunification services or services by DCFS for you on [Child] and here we are again with a severely abused child.

¶28 This explanation is sufficient to show that the court adequately considered whether Mother had failed to respond to previous reunification services. The court weighed Mother's prior compliance against her actions following the completion of the original services. Because the court's decision is not "against the clear weight of the evidence," a "measure of deference is owing" to the court's decision. *In re E.R.*, 2021 UT 36, ¶ 32 (quotation simplified). Accordingly, we will not perform an "independent 'reweighing' of the evidence" but will instead "respect[]" the court's decision. *Id.*

¶29 Second, Mother contends the juvenile court improperly weighed against her the factors concerning "any history of violent behavior directed at the child or an immediate family member" and "any patterns of the parent's behavior that have exposed the minor to repeated abuse." *See* Utah Code § 78A-6-312(23)(c), (e) (2020). Specifically, Mother asserts these factors do not weigh against her because she "was not adjudicated as abusing [Child] in 2017," there are "no other allegations" that Child or Sister have been otherwise injured, and it has "never been established that Mother harmed [Brother]."

¶30 But Mother's arguments on this point ignore substantial record evidence indicating that Mother did have a history of violent behavior directed at Child or Child's immediate family members and that Mother's behavior exposed Child to repeated abuse. While Mother is correct that she was not adjudicated as abusing Child in 2017, Child's statements to his foster mother and therapist provide substantial evidence of Mother's history of violent behavior toward Child and other immediate family

members. Notably, the juvenile court found that during a therapy session, Child credibly reported to his therapist that he had witnessed Mother "hit his sibling on the head." And at trial, Child's foster mother testified that on multiple occasions, Child told her that Mother had hit him. Further, as the juvenile court found, Child, Brother, and Sister were all exposed to repeated abuse while in Mother's care. Indeed, Child and Sister were found to be "siblings at risk" and "neglected" based on Mother's rule 34(e) plea to the allegation that Brother suffered "severe physical abuse while in the care of [Mother]." This exposure occurred subsequent to the court's 2017 determination that Child had been "abused by an unknown perpetrator" during a time when Mother "was the primary caregiver."

¶31　The juvenile court did not abuse its discretion by deciding not to order reunification services for Mother. In reaching this decision, the court evaluated the evidence before it, and Mother has not demonstrated that the court's decision was against the clear weight of the evidence.[7]

---

7. Mother challenges the adequacy of the juvenile court's findings in support of its decision not to order reunification services by asserting that "the juvenile court made no findings in its reunification order." But Mother's assertion is overbroad; the juvenile court did make explicit factual findings regarding a number of the facts we have noted as supportive of its determination not to order services. And, while we acknowledge that the court did not explicitly disclose all the analytic steps it took in deciding not to provide services, this is a case where the court's "unstated findings can be implied" because "it is reasonable to assume that the [juvenile] court actually considered the controverted evidence and necessarily made . . . finding[s] to resolve the controversy, but simply failed to record the factual determination[s] made." *Fish v. Fish*, 2016 UT App 125, ¶ 22, 379

(continued…)

## II. Strictly Necessary

¶32 Next, Mother argues the juvenile court erred in determining it was strictly necessary to terminate her parental rights to Child. In particular, Mother contends the court's strictly necessary analysis was "improperly brief and conclusory."

¶33 "Because the relationship between parent and child is constitutionally protected, a court may only terminate parental rights upon a finding that termination is strictly necessary to the best interest[] of the child."[8] *In re S.T.*, 2022 UT

_____

P.3d 882 (quotation simplified). It is not a case "where there is a matrix of possible factual findings and we cannot ascertain the [juvenile] court's actual findings." *Hall v. Hall*, 858 P.2d 1018, 1025–26 (Utah Ct. App. 1993) (quotation simplified). The evidence and arguments presented below, coupled with the juvenile court's decision not to order services, necessarily imply that the juvenile court found the factors in Utah Code subsections 78A-6-312(23)(c) and (e) weigh against the provision of services based on the findings and evidence we have outlined above. Although on this record the unstated steps of the juvenile court's analysis can be implied, we caution courts to ensure that the analytic steps taken in support of such fact-sensitive decisions are fully articulated in an oral or written ruling, order, or judgment. Detailed findings aid appellate review and reduce the likelihood of reversal.

8. "To terminate a parent's rights, Utah law requires that both elements of a two-part test are satisfied. First, the court must find that one or more of the statutory grounds for termination are present. Second, the court must find that termination of the parent's rights is in the best interest[] of the child." *In re S.T.*, 2022 UT App 130, ¶ 25 n.5, 521 P.3d 887 (quotation simplified). Here, Mother acknowledges the juvenile court properly found at least

(continued…)

App 130, ¶ 25, 521 P.3d 887 (quotation simplified). "This analysis should be undertaken from the child's point of view, not the parent's." *In re B.T.B.*, 2020 UT 60, ¶ 63, 472 P.3d 827 (quotation simplified).

¶34 When evaluating whether termination is strictly necessary, the juvenile court must address whether "the child can be equally protected and benefited by an option other than termination." *Id.* ¶ 66. This inquiry cannot be satisfied merely by relying on the "categorical concern" that adoption offers the highest degree of permanency. *In re J.A.L.*, 2022 UT 12, ¶ 25, 506 P.3d 606. Instead, the court must analyze the "particularized circumstances of the case" and "explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights." *In re S.T.*, 2022 UT App 130, ¶ 26 (quotation simplified). If another option exists where "the child can be equally protected and benefited," then "termination is not strictly necessary" and "the court cannot order the parent's rights terminated." *In re B.T.B.*, 2020 UT 60, ¶ 66.

¶35 In determining that it was strictly necessary to terminate Mother's parental rights, the juvenile court explicitly stated that it "considered whether a placement with Permanent Guardianship would equally protect and benefit [Child]." Ultimately, the court decided against such an arrangement, finding it was not in Child's best interest "as it does not provide the permanency that he seeks and wishes for." Citing *In re J.A.L.*, 2022 UT 12, 506 P.3d 606, Mother contends this conclusion was error because it is based on the categorical concern that a permanent guardianship is not as

one ground to terminate her parental rights. Accordingly, our focus is limited to only the court's best interest determination.

permanent as an adoption.[9] Mother's argument is unavailing, however, because it selectively focuses on the court's conclusion without considering it in the fuller context.

¶36 Here, the juvenile court was not presented with any feasible alternative option for a permanent guardianship placement, nor has Mother proposed one on appeal. At the time of trial, the only individuals that had previously been involved in the case were not feasible placement options. Indeed, Grandfather had failed to comply with the safety plan by allowing Mother to interact with Child outside his "line of sight," which ultimately led to Child's removal; Grandmother and Mother were estranged; and the State had initiated termination proceedings for Father.[10] Consequently, there was "no other option, short of termination

---

9. In a related vein, Mother also asserts the juvenile court's decision was conclusory because the court focused only on negative testimony and overlooked the positive testimony of several of Mother's therapists. But this position ignores that "[i]t is the role of the juvenile court, not this court, to assess the weight and credibility of expert witnesses and to choose among their testimonies." *In re G.V.*, 916 P.2d 918, 920 (Utah Ct. App. 1996) (per curiam). As such, we decline to reweigh the evidence.

10. The lack of alternative options was reiterated through the trial testimony of Child's great-uncle (Uncle). Uncle testified that Mother and Grandfather were estranged, largely due to Grandfather's role in having Child removed from Mother's custody, and that Mother and Grandmother were estranged because Grandmother is "a very toxic individual" and "abusive toward" Mother. Uncle also explained that although he wanted to be "involved" with Child, he was not in a position for Child to be placed with him. Lastly, Uncle noted that his brother had applied for Child to be placed with him, but his application was not approved.

and adoption, that would have otherwise been apparent to the juvenile court." *See In re D.G.*, 2022 UT App 128, ¶ 8 n.2, 522 P.3d 39, *cert. denied*, 527 P.3d 1106 (Utah 2023). And "where only one feasible custody option exists, the categorical concern that adoption is more stable than a permanent guardianship is not implicated." *In re S.T.*, 2022 UT App 130, ¶ 32 n.6 (quotation simplified).

¶37 In sum, given Child's "strong emotional ties with [his] foster parents," *see id.*, and the lack of "any remotely feasible alternatives to termination and adoption," *see In re D.G.*, 2022 UT App 128, ¶ 8 n.2, it was entirely proper for the juvenile court to find that it was strictly necessary to terminate Mother's parental rights.[11]

---

11. We again caution juvenile courts to "adequately disclose[]"—either in an oral or written ruling—all the "analytic steps" they take when they conduct a best interest analysis. *Keiter v. Keiter*, 2010 UT App 169, ¶ 21, 235 P.3d 782 (describing a challenge to the adequacy of findings as raising the issue of whether "the findings as a whole adequately disclosed the analytic steps taken by the trial court"). Here, however, even assuming that the court's articulation of its strictly necessary analysis could have or even should have been more robust, without any feasible alternatives to termination and adoption, Mother cannot show that the court's finding on this point was against the clear weight of the evidence. *See generally In re J.J.W.*, 2022 UT App 116, ¶ 19, 520 P.3d 38 ("[I]n some instances (e.g., where the existence of a particular option would not be readily apparent to the court), a parent may need to expressly ask a [juvenile] court to consider a specific non-termination option in order to properly preserve the right to argue, on appeal, that the court did not adequately consider that option."). But in cases where a feasible alternative placement option does exist, a court assessing strict necessity must explain,

(continued…)

CONCLUSION

¶38 The juvenile court did not err in terminating Mother's parental rights to Child. The court's decision to deny Mother reunification services was not an abuse of discretion because the court's decision is well supported by evidence in the record. And the court did not err when it found that termination of Mother's parental rights was strictly necessary because there were no feasible alternative placement options other than termination and adoption. Affirmed.

---

"on the record," why adoption and termination of the parent's rights would better further the child's best interest than the alternative option. *See In re B.T.B.*, 2020 UT 60, ¶ 74, 472 P.3d 827.