**2026 UT App 14**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF L.J. AND J.J.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

T.J.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20241074-CA
Filed February 5, 2026

Second District Juvenile Court, Farmington Department
The Honorable Sharon S. Sipes
No. 1215224

Alexandra Mareschal and Jason B. Richards,
Attorneys for Appellant

Derek E. Brown, Deborah A. Wood, and
John M. Peterson, Attorneys for Appellee

Martha Pierce, Alisha Giles, and Heath Haacke,
Guardians ad Litem

Emily Adams, Attorney for Amici Curiae
Adoption Mosaic, Dorothy Roberts, Elephant Circle,
Movement for Family Power, and Legal Services for
Prisoners with Children

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1    T.J. (Father) appeals the termination of his parental rights
to his children, L.J. and J.J. Given the lengthy history of the case

and the narrow focus of the issues on appeal, we discuss the relevant facts in the context of our analysis below. For the reasons discussed therein, we reject Father's challenges and affirm.

ISSUES AND STANDARDS OF REVIEW

¶2     First, Father challenges the juvenile court's finding that termination of his parental rights was in the best interest of L.J. and J.J. In particular, he argues that the court (1) disregarded the testimony of his expert witness regarding transracial adoption and (2) made and relied on incorrect findings about Father's history of incarceration. "We review deferentially a lower court's best-interest determination and will overturn it only if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *In re M.M.*, 2023 UT App 95, ¶ 19, 536 P.3d 102 (quotation simplified), *cert. denied*, 544 P.3d 456 (Utah 2024).

¶3     Second, Father challenges the juvenile court's conclusion that the Utah Division of Child and Family Services (DCFS) made reasonable efforts to reunify him with the children. Because "reasonableness is an objective standard that depends upon a careful consideration of the facts of each individual case . . . , we afford the juvenile court broad discretion in determining whether reasonable reunification efforts were made." *In re S.T.*, 2022 UT App 130, ¶ 17, 521 P.3d 887 (quotation simplified).

ANALYSIS

I. The Children's Best Interest

¶4     "A court may terminate parental rights only after making two necessary findings—first, the court must find, by clear and convincing evidence, that at least one statutory ground for termination exists, and second, the court must find that

termination of the parent's rights is in the best interest of the child." *In re J.M.*, 2024 UT App 147, ¶ 25, 559 P.3d 473 (quotation simplified). Father's appeal centers on the best-interest inquiry. "Because any number of factors can have bearing on the child," this "inquiry is a broad-ranging, holistic examination of all the relevant circumstances that might affect a child's situation." *Id.* ¶ 26 (quotation simplified). "And termination must be strictly necessary from the child's point of view." *Id.* (quotation simplified).

¶5    Father argues that the juvenile court erred in concluding that termination was in his children's best interest because the court (1) disregarded the testimony of his expert witness and (2) made and relied on incorrect findings about Father's history of incarceration. We disagree on both counts.

A.    Expert Testimony

¶6    Father's expert witness (Expert) testified at the termination trial about the effects of racism in the context of transracial adoptions, which occur when children "are adopted within a family that is different from their culture and ethnicity." Expert testified that L.J. and J.J. might experience a transracial adoption should Father's rights be terminated because they are biracial—Father being Black and their mother being White.[1] Expert identified several negative impacts of transracial adoption, including "[l]oss of identity and culture," such as "family traditions, customs, and so forth." And she testified about the "lack of sense of self and understanding of self" that transracially adopted children experience when they "no longer have a relationship with their family."

---

1. The parental rights of the children's mother were also terminated, and her separate appeal was resolved by an order affirming the termination. *See* Order, *In re L.J.*, No. 20240966 (Utah Ct. App. May 7, 2025).

¶7 Expert testified that Father's primary concern was not "just necessarily" that his children might be transracially adopted but that they may be "adopted in general," which would constitute "the loss of his children." But Expert also noted that Father was concerned about the children losing their identity if they were adopted into a White family, as seemed likely given their foster placement. She testified that it is "extremely difficult" to identify specific aspects of one's own culture but that Father had identified the personal significance of "what Black culture means to him," stemming from his family heritage in Georgia and his playing a "traditional historical Black" card game with his family.

¶8 Expert also testified that "communal parenting" or "coparenting"—where "adoptive parents are essentially sharing their adopted children with the birth parents"—might produce better outcomes and a "healthy identity" for "children of color." And she testified that L.J. and J.J. having merely occasional contact with Father's biological family was unlikely to address her concerns about the effects of their possible transracial adoption. Expert did not address the cultural identity of the children's mother, but she emphasized that "[r]esearch supports that children are best with their families, and that agencies are to create safer environments for children to remain with their families to have healthier and better outcomes."

¶9 Far from ignoring this testimony, as Father insists, the juvenile court spent several pages of its lengthy findings discussing and crediting much of the testimony. But the thrust of Expert's conclusion was that permanent guardianship is preferable to transracial adoption. And despite taking Expert's testimony into account, the court concluded that, in this case, permanent guardianship was not in the children's best interest. The court found that a permanent guardianship and custody arrangement "between the foster family and biological parents will be a 'forced contact' which will not be helpful to the stability and permanency necessary for [the children's] well being" but

would instead inject "the chaos of" the biological parents' relationship "into the stability and routine the children experience" in their foster placement. And the court noted that prior efforts to place the children with Father's relatives in Georgia had failed and that the children were closely bonded with their current foster family, which happens to be White.

¶10 Moreover, the court found that Expert offered "no information about Father's particular culture or history that causes concern about the children losing their cultural identity if they are adopted by a white family," nor did she offer any "information about relevant considerations for [the] cultural background or history" of the children's mother. In the court's view, Expert's testimony did not specifically address "transracial adoptions of biracial children" in a way that was particularly helpful to the court in assessing the best interest of L.J. and J.J.

¶11 We certainly do not disagree with Expert's testimony about the pervasive problem of racism in society and the disadvantages that Black children face when placed in transracial adoptions. But the juvenile court was ultimately "not bound to accept" Expert's testimony in its entirety, and the court was "free to judge" Expert's testimony and conclusions in terms of their "credibility and . . . persuasive influence in light of all of the other evidence in the case." *In re K.C.*, 2013 UT App 201, ¶ 13, 309 P.3d 255 (quotation simplified). *See id.* (further explaining that "the juvenile court, as a trier of fact, may accord" an expert's "opinion whatever weight it deems proper") (quotation simplified). And given the court's careful consideration of Expert's testimony, we cannot agree with Father's suggestion that the court wholly disregarded or misunderstood the testimony.

B.    Father's Incarceration

¶12 Father was incarcerated several times over the course of this case. He was in jail from September to December 2022 after the incident that initiated this case. After failing to appear on those

criminal charges, he returned to jail in January 2023 and then again in March 2023 for criminal trespassing, pretrial violation of a protective order, and threat of terrorism. He was again incarcerated from December 2023 to January 2024 for probation violations. And he spent one day in jail in March 2024 after resisting arrest and fleeing from an officer. At the time of the termination trial in May 2024, Father had been incarcerated for another five days. And, through no fault of his own, Father had once been mistakenly identified and arrested for domestic violence perpetrated by another individual.

¶13　Father faults the juvenile court for misconstruing the facts surrounding this wrongful arrest, arguing that the court's finding that "he has not gained the ability to avoid incarceration" was "substantially" based on this alleged misconstruction on the court's part. But the court made other findings regarding Father's "frequent encounters with law enforcement." Thus, it is simply incorrect to assert that the court relied solely on this one incident of mistaken identity or that the court's findings about Father's other periods of incarceration were against the clear weight of the evidence.

¶14　In sum, Father has not persuaded us that the juvenile court erred in concluding that termination of his parental rights was strictly necessary and in the best interest of the children.

## II. Reasonable Reunification Efforts

¶15　"When the juvenile court orders DCFS to provide reunification services to a parent, the court must find that 'reasonable efforts' were made to provide those services before the court may terminate the parent's rights." *In re S.T.*, 2022 UT App 130, ¶ 17, 521 P.3d 887 (quoting Utah Code Ann. § 80-4-301(3)(a) (LexisNexis Supp. 2022)). "A reasonable effort is a fair and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights." *Id.* (quotation simplified). Father argues the juvenile court could not find that DCFS made

such an effort to reunify him with the children because, in his view, the agency "provided no meaningful support," "compounded the systemic racism" he experienced, and "failed to use culturally appropriate service providers for the children and parents." We disagree.[2]

¶16    In its findings, the juvenile court recognized that "Father was incarcerated numerous times throughout the case." *See supra* ¶ 12. And it found that the DCFS caseworker "made little effort to contact Father while he was incarcerated." The court also found that "Father behaves in a manner that others may view as unsafe under some circumstances." But despite being "fearful" of Father, the caseworker "arranged for Father's opportunity for ongoing contact [with DCFS] by transferring contact to an office providing different security." And the court found that the caseworker had provided Father with several opportunities for services, including appointments for mental health assessments that Father missed. The court also chronicled an incident in which Father—despite a protective order preventing him from contacting the children's mother—encountered the caseworker at the hospital during the birth of J.J., and the caseworker made an appointment to discuss the case with him, which Father "chose not to attend."

¶17    The court further found that Father's "decision to seek treatment and assistance" privately, "his research and enrollment in online education, his ability to get to appointments with his probation officer, his regular appearance at various court hearings, and his ability to obtain employment" all belied his claims of inability to meet his obligations with DCFS. The court specifically found that Father had "shown his ability to comply

---

2. The guardians ad litem argue that Father has not preserved this issue. But because the issue can be readily resolved in favor of the guardians' position, we choose to address it anyway. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415, *cert. denied*, 496 P.3d 718 (Utah 2021).

when he wants to." Finally, the court recognized that "Father did not offer evidence he requested any accommodations or culturally sensitive treatment providers."

¶18    With the benefit of hindsight, DCFS's efforts in this case were perhaps not as fulsome as they should have been. But, again, "a reasonable effort is a fair and serious attempt" at reunification, not a perfect one. *In re S.T.*, 2022 UT App 130, ¶ 17 (quotation simplified). And "reasonableness is an objective standard that depends upon a careful consideration of the facts of each individual case." *Id.* (quotation simplified). Additionally, "the process of reunification is recognized as a two way street which requires commitment on the part of the parents, as well as the availability of services from the State," and Father "bore the responsibility of participating in and completing those services" provided to him by DCFS. *Id.* ¶ 23 (quotation simplified).

¶19    Given the "broad discretion" we afford the juvenile court's reasonableness determination, *id.* ¶ 17 (quotation simplified), we cannot say the court erred in concluding that DCFS made an adequate attempt to provide meaningful reunification services to Father under the circumstances of this case.

## CONCLUSION

¶20    Because neither of Father's challenges to the termination of his parental rights is availing, we affirm.

———————